878 P.2d 913 (1994)
In re Petition for a Writ of Prohibition or in the Alternative for a Writ of Mandamus.
The Honorable Jerry Carr WHITEHEAD, Petitioner,
v.
NEVADA COMMISSION ON JUDICIAL DISCIPLINE, Respondent.
No. 24598.
Supreme Court of Nevada.
July 26, 1994.
*915 Ohlson & Springgate, Hamilton & Lynch, Reno, Gentile, Porter & Kelesis, Laura Wightman FitzSimmons, Las Vegas, for petitioner.
Frankie Sue Del Papa, Atty. Gen., Brooke Nielsen, Asst. Atty. Gen., Carson City, Donald J. Campbell, Las Vegas, for respondent.

OPINION
ADDELIAR D. GUY, District Judge.
On May 20, 1994, the court heard oral argument on a number of motions filed by both parties. Today, we address Petitioner Whitehead's "motion to preclude further illegal involvement in [this] case by attorney general and associates in order to promote the administration of justice and guarantee due process of law in this and related proceedings" and Petitioner Whitehead's "motion for order to show cause, an investigation, and a protective order," and "motion for appointment of a master to conduct factual investigation."
We are compelled to conclude that Petitioner's motions are meritorious. We accordingly order that Attorney General Frankie Sue Del Papa, Assistant Attorney General Brooke Nielsen and Special Deputy Attorney General Donald J. Campbell be removed as counsel for the Nevada Commission on Judicial Discipline ("Commission") in these writ proceedings and in all disciplinary proceedings now pending against Petitioner Whitehead before the Commission.[1] For reasons hereinafter specified, the Office of the Attorney General is precluded from acting as legal advisor or prosecutor in the present matter or in any matter relating to the constitutional duties of the Commission to hear and decide judicial discipline complaints.
In granting Petitioner Whitehead's motion for the appointment of a master to conduct a factual investigation, we grant the motion in part by adjudicating the clear need for the appointment of a special master, but we defer our decision as to the scope of the investigation and the identity of the investigator for resolution in the near future.[2]

REMOVAL OF THE ATTORNEY GENERAL, THE ASSISTANT ATTORNEY GENERAL AND SPECIAL DEPUTY ATTORNEY GENERAL CAMPBELL AS COUNSEL FOR THE COMMISSION
Petitioner Whitehead urges three grounds for requiring the Attorney General's removal as legal counsel and prosecutor for the Commission. The first ground is that the Attorney General, as an elected, Constitutional officer of the Executive Department of Nevada's government, is not permitted by the separation of powers clause of our State Constitution to represent the Commission in the *916 exercise of its disciplinary functions or to exercise powers relating to judicial discipline proceedings that are constitutionally vested in the Discipline Commission. The second ground is that, generally, and under the specific facts of this case, the Attorney General has a number of disqualifying conflicts in representing the Commission. These conflicts include the conflicts relating to giving the Attorney General access to confidential documents and proceedings of the Commission, the conflict arising out of the fact that the Attorney General is official counsel for the judges and justices of the state, and, most importantly, the conflict arising out of the Attorney General's acting as legal advisor to the Commission (which is Petitioner Whitehead's judge and jury) and at the same time prosecuting Whitehead before the tribunal to which the Attorney General has been giving legal advice and counsel. Of equal concern and importance is the problem and potential problem of the Attorney General, and district attorneys over whom the Attorney General has the power of supervision,[3] prosecuting criminal and civil cases before judges who are under investigation and prosecution by the Attorney General in Commission proceedings, and the potential for holding such judges actual or imagined "hostages" without any awareness by opposing counsel. As to the third ground which Petitioner Whitehead asserts for seeking the removal of the Attorney General as the Commission's lawyer and prosecutor, we conclude that the Attorney General must be removed as counsel and prosecutor for the Commission in this case. Our conclusion is based on the stated constitutional grounds and on the mentioned conflict of interest created by the Attorney General's office, particularly, the Attorney General's acting as both legal advisor to the Commission and as the prosecutor who has been prosecuting Petitioner Whitehead before the Commission. It is unnecessary to reach the claim relating to the Attorney General's misconduct in arriving at our decision on this motion.

First Ground: Constitutional Disqualification[4]
Article 3, section 1 of the Nevada Constitution provides as follows:
The powers of the Government of the State of Nevada shall be divided into three separate departments,the Legislative, the Executive and the Judicial; and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in the cases herein expressly directed or permitted.
This court has consistently affirmed that "[t]he division of powers is probably the most important single principle of government declaring and guaranteeing the liberties of the people." Galloway v. Truesdell, 83 Nev. 13, 18, 422 P.2d 237, 241 (1967). This principle is also of Federal Constitutional dimension and has occupied a position of unquestioned importance since the early days of the Republic. As James Madison noted in The Federalist No. 47, "`[w]ere the power of judging joined ... to the executive power, the judge might behave with all the violence of the oppressor'" (quoting Montesquieu). Merging the adjudicative power of the Commission with the executive power, as evidenced *917 in the case before us raises this very specter.
Article 6 (the Judicial Article), section 21 of the Nevada Constitution creates the Commission on Judicial Discipline. The Commission is a part of the judicial branch of government, vested with the constitutional power to "censure, retire or remove" a judge or justice, subject to such rules as this court might promulgate, and subject to appellate review by this court. Nev. Const. art. 6, § 21(1). The Attorney General, on the other hand, is "a constitutional officer in the executive branch of government" whose various duties are established by the legislature. See Ryan v. District Court, 88 Nev. 638, 642, 503 P.2d 842, 844 (1972); see generally Nev. Const. art. 5 § 19. In matters of judicial discipline, it is the Commission, not the Attorney General, which the constitution vests with the power and duty to deal with all matters relating to erring judges who are charged with violating the Code of Judicial Conduct. The Commission is constitutionally empowered to "designate for each hearing an attorney or attorneys at law to act as counsel to conduct the proceeding," (id. at art. 6, § 21(9)(a)). Nowhere in the constitution is the Commission required or empowered to employ the Attorney General, a member of a separate and co-equal branch of government, to act as its counsel.[5] It is not constitutionally permissible for the Attorney General to investigate or prosecute a judge or justice on behalf of the Commission. The Attorney General may not represent the Commission in judicial discipline matters, nor may the Attorney General "prosecute" a judge or justice before the Commission, because "one department cannot exercise the power of the other two" without violating article 3, section 1 of the Nevada Constitution. Galloway, 83 Nev. at 19, 422 P.2d at 242.[6]
Although the Commission disputes that the Attorney General's office engaged in exercising any Commission functions, the record clearly reflects that Special Deputy Attorney General Don Campbell engaged in a very extensive investigation of the allegations against Petitioner on behalf of the Commission. Mr. Campbell's affidavit also indicates that he was involved in carrying out the Commission function of screening complaints and that in doing so made the determination that many of the incidents alleged in one of the complaints against Petitioner did not warrant further action by the Commission. Whether Special Deputy Attorney General Campbell was acting for the Commission in making these Commission decisions or was merely advising the Commission to take these actions, the executive branch, through the Attorney General's office, has been actively engaged in the judicial discipline processa process that can be carried out properly and constitutionally only by the Commission on Judicial Discipline itself. Nev. Const. art. 6, § 21(7).
*918 The State of Minnesota has recognized that it is not proper for the Attorney General to act as the Attorney General has acted in this case. See Rules of Board on Judicial Standards, Minn. Rules of Court, Rule 1(d)(10) at 693 (West Supp.1994) (Authorizing the Executive Secretary of the Board on Judicial Standards to "[e]mploy, with the approval of the board, special counsel, private investigators, or other experts as necessary to investigate and process matters before the board or the Supreme Court. The use of the attorney general's staff for this purpose shall not be allowed.") (Emphasis added.) The source of and basis for the Minnesota rule is the ABA's Standards Relating to Judicial Discipline and Disability Retirement. See Judicial Conduct Organizations Governing Provisions (Kathleen Sampson, ed., 1984). Standard 2.8 states that the use of members of "the attorney general's staff" to perform commission functions "is not recommended.... Their use may also interfere with the independence of the judiciary." Id. at 15; see infra note 5 (emphasis added).
We are, of course, well aware of NRS 1.450(2) which commands the Attorney General to act as counsel "upon request" of the Commission. If the Commission or its members were to be sued for, say, some alleged tortious activity, there would be no bar to the Attorney General's defending such a lawsuit, as long as it did not involve the Commission's constitutional mandate to hear and decide misconduct complaints against judges.[7]
If we were to read NRS 1.450(2) as permitting the Attorney General to represent the Commission in matters relating to specific cases of judicial discipline or, worse, as permitting the Commission's legal advisor also to be the prosecutor of judicial discipline complaints, such a reading would run contrary to the constitution. State v. Douglass, 33 Nev. 82, 92, 110 P. 177, 180 (1910) ("the Legislature, in the absence of express constitutional authority, is as powerless to add to a constitutional office duties foreign to that office, as it is to take away duties that naturally belong to it"). The statute may properly permit the Commission to seek the legal advice of the Attorney General, much as another state entity might[8]; however, the statute cannot permit the invasion of the judicial department by the executive department of government. This would occur if the Attorney General were permitted to sit in from day to day in the Commission's meetings, during which the principal Commission business is to deal with matters relating to judicial discipline. To allow this would be to allow the Attorney General to become almost an ex facto member of the Commission. It must be remembered that the Attorney General and her extensive staff must, in the performance of their constitutional duties, appear before the judges and justices of this state on a daily basis. If those same lawyers are privy to confidential and damaging information about judges, then, at the very least, the appearance of an impartial tribunal is lost. See conflict of interest section, infra, pp. 9-13; compare ARJD 2(9) ("Prosecuting officer means an attorney designated by the commission to file and prosecute the Formal Statement of Charges.") (Emphasis added.)
We must necessarily disapprove of the practice of having a member of the Attorney General's staff routinely participate in Commission meetings and deliberations.[9] The policy rationale behind requiring the Commission to use independent counsel to perform both advisory and prosecutorial functions for the Commission in judicial discipline *919 proceedings is obvious: it ensures that disciplinary proceedings are not pursued for personal, partisan, or political gain, and it ensures that one branch of government does not usurp the vital functions of another or place itself in the position of holding the others hostage.
Where a statute is susceptible to both a constitutional and an unconstitutional interpretation, this court is obliged to construe the statute so that it does not violate the constitution. Sheriff v. Wu, 101 Nev. 687, 708 P.2d 305 (1985). NRS 1.450(2) is constitutional insofar as it permits the Commission to request official legal opinions of the Attorney General in matters unrelated to judicial discipline. NRS 1.450(2) cannot be constitutionally read to authorize the Attorney General to act as counsel to the Commission or to act as prosecutor in judicial discipline proceedings.

Second Ground: The Attorney General's Conflict of Interest.
Amici (Ad Hoc Committee for the Preservation of an Independent Judiciary) argue that the involvement of the Attorney General in the disciplinary process creates hopeless conflicts of interest and roles and that such involvement creates an untoward and undesirable opportunity for undue influence upon the judiciary. We examine this argument carefully.
First we look at the potential for abuse inherent in any involvement by the Attorney General in the disciplinary process. As we held in Whitehead I, the Commission is part of the Judicial Department. See Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 159, 869 P.2d 795, 814 (1994). The rules this court has adopted pursuant to its constitutional mandate provide a clear requirement of confidentiality at least until after a probable cause hearing, a finding of probable cause, and the filing of a formal statement of charges. ARJD 5(1). It is not difficult to see the possibilities that exist if the Attorney General is allowed to participate in the Commission's disciplinary activities. If the Attorney General has free access to the confidential information in possession of the Commission, the temptation is clearly present for putting adverse, confidential information about a judge to improper and even political use. Anonymous "leaks" or threats of leaks could very well provide those with improper access to confidential information about judges considerable leverage over sitting judges, who, in our elective system, are always faced with the possibility of a contested election. Although we are not suggesting the existence of such implications in the present case, there is certainly a potential for an Attorney General who has adverse information relating to a judge to use this information to damage the career of any judicial officer that is seen as a political threat to the Attorney General or to his or her political allies or political agenda.
The Attorney General's office, as now constituted, has close to one hundred attorneys who appear in many courts of this state. It is not difficult to see how the independence of judges might be compromised if a judge before whom a deputy attorney general was appearing felt threatened by the Attorney General's possession of confidential information, whether true or not, that might be harmful to the judge if released to the public.
The threat just described is only one of the possible conflicts presented by allowing the Attorney General to participate in the judicial discipline process. Another conflict is presented by the fact that the Attorney General is the official legal representative of the judges and justices in this state and cannot, by the nature of that office engage in the prosecution of the very judges that the Attorney General represents as counsel.[10] It is not the foregoing conflicts, however, that give us the most pause. The most dangerous conflict lies in the Attorney General's acting as both legal counsellor to the Commission and as prosecutor of judicial discipline complaints.
Special Deputy Attorney General Campbell has been acting in the role of investigator *920 and prosecutor in this case. The Attorney General apparently sees nothing untoward or unusual about Special Deputy Attorney General Campbell's acting in such capacities in this case, as the Attorney General freely tells us that her office has "investigated and processed literally dozens of [other] judicial misconduct complaints over the years." Petition for Rehearing at 7. Such engagement by the Attorney General in the investigation and prosecution of judges is not only a violation of the separation of powers doctrine of our Constitution, it is a conflict of interest for the Attorney General to be prosecuting before the Commission the very judges that she represents as counsel, and before whom she appears in the course of prosecuting criminal and civil cases. Again, of equally great concern is the conflict created by the Attorney General's acting as either prosecutor or legal advisor to the judicial tribunal.
It cannot be denied that the Attorney General has been acting as legal advisor to the Commission while investigations and prosecutorial activities were being conducted by that office against Petitioner Whitehead. Ordinarily, a client's regular consultation with his or her attorney, by the nature of the relationship, tends to instill feelings of trust and confidence and, frequently, friendship as between the client and the attorney. Most readers of this opinion should not have to be further convinced that it is simply not fair to require an accused judge or justice to appear before a tribunal where the judge's prosecutor is also acting as legal counsel to the tribunal. In our adversarial system we have always been scrupulous about keeping adjudicative functions separate from the prosecutive function, and fairness requires that we continue to do so.
The proposed changes to the American Bar Association's Model Rules for Judicial Disciplinary Enforcement deal quite extensively with this problem. The Report and Recommendation to the ABA House of Delegates strongly recommends "the separation of conflicting functions." Thus "[a] commission member who participates in the investigation should not participate in the adjudicative process and vice versa." Similarly, the proposed Model Rules also envision separate counsel for the Commission: One attorney ("disciplinary counsel") would assist the Commission in performing its investigative and prosecutorial functions, another ("commission counsel") would provide the Commission with "legal research, drafting, and advice." The report observes that the roles of prosecutor and advisor are "inconsistent" and ought not be embodied in a single person, because such a separation of functions is "crucial to the perception of fairness." The report also notes that "[a] system that relies on other government agencies to investigate complaints or present evidence, or both, loses efficiency and endangers confidentiality," concluding that "[d]isciplinary counsel should not use law enforcement officials or staff to investigate complaints or present cases.... Their use could compromise the confidentiality of investigations and could pose separation of powers problems."[11]
The conflicts envisioned by the ABA have manifested themselves all too clearly in the manner in which cases are currently being handled by the Commission. As noted in Whitehead II, the Attorney General and the Commission have had at least one judge under some kind of supervisory control or "probation," which requires the judge to report to the Attorney General's Office under penalty of more severe disciplinary action in the event the "probation" fails. This supervision is going on while the Attorney General's staff is presumably still trying cases before the supervised judge. 110 Nev. at ___, 873 P.2d at 971. This is a clear conflict of *921 interest. Obviously, the Attorney General or the district attorneys over whom she has supervisory control, appear in an adversarial setting before the very judges she is investigating or is supervising under "probation." Again, given the current rules of confidentiality surrounding judicial discipline matters prior to a finding of probable cause, it is inevitable that some members of the Attorney General's and district attorneys' staffs will appear before judges while in possession of damaging and confidential information about those judges. This may compromise the appearance of an impartial tribunal.[12]
The Commission has asserted that if this court does not allow the Attorney General to act as Commission counsel, the Commission will be unable to fulfill its constitutional function. This rather extravagant assertion may be rejected out-of-hand because the rules clearly contemplate that the Commission may employ independent counsel. ARJD 41; Nevada Const. art. 6 § 21(9)(a). We also reject the Commission's argument that this court will violate the Commission's right to counsel of its choice and thereby deny the Commission due process of law if it determines that the Attorney General may not act as she has in this proceeding. Even if we were to assume that a public body has some identifiable legal right to "counsel of its choice," such a right would not include the Commission's right to be represented by counsel with the clear conflict of interest problems that are discussed in this Opinion; and, certainly such a right could not be sufficient to overcome the separation of powers clause of the Nevada Constitution. See Kabase v. District Court, 96 Nev. 471, 611 P.2d 194 (1980).
The separation of powers clause of the Nevada Constitution prohibits the Attorney General from acting as prosecutor of judges in judicial discipline cases and from acting as the Commission's counsel in disciplinary matters. We have, of course, already held that the Attorney General may issue official opinions to the Commission and that the Attorney General may "supply[ ] the Commission with abstract advice on an occasional basis...." Whitehead I, 110 Nev. at 133 n. 5, 869 P.2d at 798 n. 5. However, this certainly does not mean that the Attorney General can advise the Commission in matters relating to judicial discipline nor that the Attorney General can act as prosecutor, prosecuting judicial discipline complaints before the Commission. What is painfully clear, as mentioned previously, is that the Attorney General may not be allowed to act as either advisor or prosecutor.[13]

*922 Ground Three: Attorney Misconduct

Petitioner Whitehead maintains as a third and independent ground for asking that the Attorney General be removed from this case the Attorney General's intemperate and accusatory public statements relating to these proceedings. Because of the foregoing conclusions regarding disqualification based upon constitutional and conflict of interest grounds, it is unnecessary to presently rule on Petitioner Whitehead's allegations of ethical misconduct on the part of the Attorney General or the effect that this conduct might have on Petitioner Whitehead's ability to receive fair treatment, which is the essence of due process.

INVESTIGATION OF BREACHES OF CONFIDENTIALITY AND VIOLATIONS OF OTHER RULES OF THIS COURT
Petitioner Whitehead claims not only that he has been severely prejudiced by the unlawful public disclosure of charges which the Nevada Constitution requires to be kept confidential, he claims that the integrity of the whole judicial discipline process is endangered by what appear to be almost routine "leaks" of judicial disciplinary proceedings.
Now is not the time to go into extended discussion of the confidentiality provisions mandated by the Nevada Constitution in judicial discipline matters, but a few words may be said.[14] The argument of some is, of course, that judges are no different from any other public official and that if any allegations of misconduct are made by anyone, such charges should immediately be open to the public. The counterargument (and the one adopted by the framers of the Nevada Constitution) is that the judiciary depends to a large degree for its effectiveness on the trust and confidence that the people place in that institution's ability to render, day-to-day, fair and impartial decisions. By its very nature, the judiciary deals with disputes that often leave litigants or counsel with negative or agitated feelings. As a result, many complaints may be generated and sent to the Commission about judges that are entirely without merit. If all of these unfounded complaints were available to the public and the media, without any inquiry into their substance, public esteem for the judiciary as a whole would suffer, thus making it more difficult for the one branch of government that should be a safe haven for the impartial and fair resolution of disputes, to inspire public confidence in the integrity of judicial proceedings.
To a great extent, the willingness of litigantsgreat and smallto respect and obey the judgments issued by our courts depends upon a deserved public perception that the judiciary does, in fact, dispense justice. Premature exposure of meritless complaints against judges would make it appear that our judges were guilty of rampant misconduct and would threaten the independent function of the judiciary. See Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D.Conn. 1992).
Whichever side of this argument one might want to espouse, the fact remains that, at present, all complaints against judges must, as commanded by the Nevada Constitution and by the rules of this court enacted in accordance with the direct command of the Constitution, remain confidential until there has been a finding of probable cause and a formal statement of charges has been filed as a public document. Despite the voices of those who minify the seriousness of breaches of confidentiality, we are unable to arrogate to ourselves a superior wisdom or authority than the people of this State who mandated the confidentiality of judicial discipline proceedings *923 in our fundamental law, the Nevada Constitution.
The Commission is entrusted with the constitutional responsibility of safeguarding the confidentiality of Commission proceedings until, under the current Commission rules, there has been a finding of probable cause. One would therefore assume that the Commission would be greatly concerned about the breaches of confidentiality in this case and in others that are documented in this record. One would further assume or at least hope that as soon as the Commission learned of these constitutional violations it would have taken immediate steps to uncover the source of the breaches and of the "leaks" that have punctuated these proceedings and expanded them into a vastly more complex and multi-dimensional dispute. To our dismay, the Commission and the Attorney General have not only evinced no concern about the breaches of confidentiality, but they have taken affirmative steps to oppose any inquiry into the source of the "leaks."[15]
It is most apparent that someone must get to the bottom of these flagrant constitutional infractions. At this stage of the proceedings we are not prepared, as a court, to launch a full investigation into these matters. Although it is clear that we have the authority to appoint a fact-finding master to delve into the source of the violations,[16] we are not ready at this time to define the scope of activities to be conducted in this regard. We do, however, conclude that an investigation into the breaches of confidentiality is warranted. A master will have to be appointed having the power to issue subpoenas and other compulsory process. In due time the court will issue an order naming the court master or other investigator and defining the scope of the powers and duties that will be necessary to carry out the required investigation.
For the reasons discussed above,
IT IS HEREBY ORDERED:
1. The Attorney General and her staff, and Special Deputy Attorney General Donald J. Campbell shall be, and the same hereby are removed as counsel to the Commission in the instant proceeding, and the Attorney General and her staff shall hereafter take no part or assume any role in disciplinary matters brought before the Commission.[17]
2. A special master shall hereafter be appointed by the court and shall be specially empowered by further and specific order of this court to conduct such investigations as shall be necessary to determine the sources of the unlawful breaches of confidentiality that have occurred in these proceedings and the extent to which they may have impacted Petitioner's due process rights.[18]
STEFFEN, V.C.J., SPRINGER, J., and ZENOFF, Senior Justice,[19] concur.
SPRINGER, Justice, concurring:
I have signed the four-judge Majority Opinion in this case because I am convinced that the Attorney General must be removed from any participation in judicial discipline prosecution of Judge Jerry Carr Whitehead. *924 I write this Concurring Opinion for two reasons: one is to answer some of the contentions raised by Justice Shearing in her Dissent, the other is that I wish to discuss the misconduct of Attorney General Del Papa, which I see as a ground for removing her from this case, in addition to, and entirely separate from, the grounds of constitutional incapacity and conflict of interest relied upon by the Majority Opinion.
Inasmuch as the Attorney General's conflicts of interest and constitutional incapacity provide ample and sufficient grounds for the action taken by the Majority, I had initially agreed that it was unnecessary to voice my view that the Attorney General's misconduct constitutes a discrete and independent ground warranting her removal from this matter. In light of the position now advanced by the Dissent, that constitutional incapacity and conflict of interest provide insufficient cause to support the Majority's decision, I now feel compelled to address the additional cause found in the Attorney General's disqualifying misconduct.

THE SHEARING DISSENT
Article 6, section 21(1) of the Nevada Constitution provides:
A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this subsection.
(Emphasis added.)
Despite this clear and unambiguous language contained in the "Judicial Article" of the Nevada Constitution, the Dissent insists: (1) that the Nevada Constitution does not vest the Commission "with the authority to exercise the judicial power of this state"; (2) that "the decisions of the Commission are not final"; and (3) that this court "alone has the power to enforce the Commission's orders."
From these three conclusions, it is apparent that my dissenting colleague perceives the Nevada Commission on Judicial Discipline as an impuissant tribunal possessed of mere advisory or recommendatory powers. Restrained by article 6, section 21(1) of the Nevada Constitution and persuasive, prior precedent of this court interpreting that provision, neither I, nor my colleagues in the Majority, are willing or able to ascribe to the view that the Commission has been relegated to the impotent and ineffectual advisory status perceived by the Dissent. Therefore, for the reasons which follow, I emphatically and respectfully reject the views expressed in the Dissent.
First, the Dissent declares:
The decisions of the Commission are not final, but are subject to review by the Supreme Court, which alone has the judicial power to enforce the Commission's orders.
This view of the Commission's authority, however, is directly repelled by this court's holding in Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), a holding which the Attorney General, on behalf of the Commission, has repeatedlyalbeit inaccurately and incompletely cited to this court in the instant proceeding.
Specifically, in Goldman, this court explained at length:
The relevant constitutional provision defining this court's jurisdictional role in an appeal challenging commission action specifies as follows:
A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this subsection.
Nev. Const. art. 6, § 21(1). Absent the prosecution of an appeal to this court by an aggrieved judge, this provision unambiguously vests the commission with final authority to order the censure, removal or retirement of a judicial officer. A commission decision to censure, remove or *925 retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court.[[1]]
This broad constitutional authority distinguishes Nevada's commission from similar commissions in other jurisdictions. The California Commission on Judicial Performance, for example, is constitutionally empowered only to make "recommendations" concerning the imposition of disciplinary sanctions. See Cal. Const. art. 6, § 18(c). Formal approval of further action by the California Supreme Court is necessary before any disciplinary sanctions may be imposed. Id.

In declaring the standard of review to be applied under this "recommendation" system, the California Supreme Court has observed:
Were a recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission's findings of fact were supported by substantial evidence. Under such a standard of review we would not be free to disregard the Commission's findings merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.

Geiler [v. Commission on Judicial Qualifications, 10 Cal.3d 270, 110 Cal.Rptr. 201, 203-04,] 515 P.2d [1,] at 4. In Geiler, however, the court further noted that the California Constitution expressly entrusts that state's high court with the sole responsibility and authority to render "the ultimate, dispositive decision to censure or remove...." Id. In exercising that authority, the California court independently evaluates the record evidence and renders its own findings of fact and conclusions of law. Judicial disciplinary procedures in many other jurisdictions are patterned after California's pioneering judicial disciplinary procedures and similarly require review and final approval of commission recommendations by a higher tribunal.

Thus, the express authority vested in this court under article 6, section 21 of the Nevada Constitution contrasts sharply with the ultimate and dispositive constitutional authority conferred upon courts of review in these "recommendation" jurisdictions. It is readily apparent that by deviating from the California model, the drafters of article 6, section 21 of the Nevada Constitution rejected California's "recommendation" system in favor of procedures intended to vest a far greater degree of authority in Nevada's commission. See, e.g., Matter of Samford, 352 So.2d 1126, 1129 (Ala.1978) (where adoption of constitutional amendment replaced old "recommendation" system of judicial discipline with new system merely authorizing appeal, Alabama court's scope of review was restricted by such amendment to a determination of "whether the record shows clear and convincing evidence to support the order of the Court of the Judiciary").

We conclude, therefore, that the Nevada Constitution does not contemplate this court's de novo or independent review of factual determinations of the commission on appeal. To the contrary, the constitution confines the scope of appellate review of the commission's factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission's findings. The commission's factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact. See Samford, 352 So.2d at 1129; cf. Geiler, [110 Cal. Rptr. at 203-04,] 515 P.2d at 4.

This court, of course, is not bound by the commission's conclusions of law. Cf. In re Jones, 728 P.2d 311, 313 (Colo.1986). *926 Moreover, where an appeal from the commission's order of censure, removal or retirement is taken, this court is expressly empowered to "reverse such action or take any alternative action provided in this subsection." Nev. Const. art. 6, § 21(1). Thus, on appeal, we are specifically enjoined by the constitution to exercise our independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the commission.
See Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 265-268, 830 P.2d 107, 116-118 (1992) (footnotes omitted; emphasis added).[2]
Thus, in interpreting article 6, section 21(1) of the Nevada Constitution, this court held in Goldman: (1) that the constitution "unambiguously" vests the Commission with "final authority to order the censure, removal or retirement of a judicial officer"; and (2) that "a commission decision to censure, remove or retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court." Id. (emphasis added).
Contrary to the Dissent's assertion that the conclusions of the Majority in Whitehead I are bereft of any supporting legal precedent, the Majority Opinion in Whitehead I did indeed cite this precise holding in Goldman as authority for the position that the Commission must be "regarded as being a constitutionally established `court of judicial performance and qualifications,' whose functions are judicial in nature and essentially of the same fact-finding and law-applying nature that the state constitution assigns to the District Courts of this State." See Whitehead I, 110 Nev. 128, 160 n. 25, 869 P.2d 795, 815 n. 25 (1994). Specifically, the Whitehead I Majority explained:
[The court in Goldman] assigned a higher status to the Commission and accorded greater deference to its final decisions than other courts have done, in accord with our view that the Commission is not to be regarded merely as an administrative agency but as a true "Court of Judicial Performance and Qualifications." Our deference to the Commission is in significant contrast to the California Supreme Court action in the case Geiler v. Comm'n on Judicial Qualifications, [10 Cal.3d 270, 110 Cal.Rptr. 201,] 515 P.2d 1 (1973). Still, the fact that we held in Goldman that the Commission, like the District Courts, is free from our de novo or independent review of factual findings only emphasizes how important it is in Nevada's system that the Commission, like our District Courts shall apply with fidelity the substantive legal principles articulated by other constituted authority. It also underscores that in Nevada it is highly important that the established substantive rules or principles be applied only in compliance with the procedural requirements delineated by constituted authority. Moreover, in Nevada, as with our District Courts, when counsel may have led the Commission to stray from its jurisdiction as defined in the rules by other constituted authority, it is important that such deviations be subject to review by interlocutory writ, as are those of the District Courts.
Id.
Notwithstanding this court's meticulously crafted prior precedent interpreting the unambiguous language of article 6, section 21(1), the Dissent seems to be saying that the Judicial Discipline Commission is a mere "fact-finding" agency, akin to the Board of Medical Examiners or the Real Estate Commission. Citing to Bergman v. Kearney, 241 F. 884, 898 (D.Nev.1917), the Dissent observes *927 that "[j]udicial power, in the constitutional sense, is something more than authority to hear and determine; it includes the power to decide finally and conclusively, and also power to carry its determination into effect." Neither I, nor the other justices in the Majority, quarrel with this definition in Kearney of "judicial power." The Dissent, however, can cite to no constitutional provision, statute, or case authority which interprets article 6, section 21 of the Nevada Constitution so as to support the further conclusion in the Dissent that the Commission on Judicial Discipline should be viewed as merely an administrative "agency or commission" which is "not vested with the authority to exercise the judicial power of this state." To the contrary, the relevant constitutional provision and case law unambiguously establish that the Commission is indeed empowered "to decide finally and conclusively" matters related to judicial disability and misconduct, and "to carry its determinations into effect."
For example, as the Majority Opinion in Whitehead I explained:
[The Commission] was created in 1976 by an amendment to the ... "Judicial Department" article of our constitution that inserts into article 6 a new section 21, which not only creates the Commission but also grants this court certain powers over it. In very broad terms, section 21(1) recognizes that the Supreme Court, theretofore also created by the "Judicial Department" article, is to have appellate jurisdiction over the Commission, as it does over Nevada's District Courts....
Whitehead I, 110 Nev. at 131, 869 P.2d at 797. Significantly, the 1976 constitutional amendment establishing the Commission amended this state's Judicial Article, the very Judicial Article cited by the Dissent as declaring where the judicial power of this state resides. Thus, while it is true that article 6, section 1 of the Nevada Constitution vests the judicial power of this state in a court system comprised of the supreme court, the district courts and the justice's courts, the Dissent overlooks the fact that the 1976 amendment changed our Judicial Article so as to vest judicial power in the Commission as well.
As amended, the Nevada Constitution's "Judicial Article," now provides that a judge or justice may be "censured, retired or removed by the Commission." Nev. Const. art. 6, § 21(1) (emphasis added). This adjudicative function includes, but is much more than, mere fact-finding. It simply cannot be seriously contended that the power "to censure, retire or remove," vested in the Commission by an amendment to Nevada's Judicial Article, does not now encompass the power to decide finally and conclusively questions related to censure, retirement and removal of a judge or justice, and to carry determinations respecting those matters into effect.[3] Thus it is not merely that the Nevada Supreme Court has the constitutional power to fashion rules for the Commission that makes the Commission a true Court of the Judiciary within the judicial branch of government. The Nevada Constitution and the citizens of this state accomplished that task.
Furthermore, as this court has previously stated, the separation of powers requires the judiciary and not another branch of government *928 to administer judicial affairs. See Dunphy v. Sheehan, 92 Nev. 259, 266, 549 P.2d 332, 336-37 (1976) (promulgation of Code of Judicial Ethics is essential to the due administration of justice and within the inherent power of the judicial department of this state). Thus, the creation of the Judicial Discipline Commission within the judicial branch of government is mandated by the separation of powers clause.
The Dissent observes that several state agencies exercise functions which may be described as quasi-judicial in nature. None of those agencies, however, have the kind of direct control over the judiciary itself which is vested in the Judicial Discipline Commission, a court constitutionally created as part of the judicial branch of government. This power to control the judiciary has been constitutionally placed within the judicial branch of government, specifically in the Commission, and it may not be directed by the executive branch without offending the doctrine of separation of powers.
The principle that a duty constitutionally entrusted to the judiciary cannot be exercised by one of the other branches of government is basic, black-letter law, appearing in standard legal reference works:
Although executive or administrative officers or bodies may exercise powers of a judicial or quasi-judicial nature incidental to the exercise of their administrative functions, they may not exercise judicial authority, or interfere with the exercise thereof by the courts.
.... [I]t is a well established and universally recognized rule of constitutional law that executive or administrative officers, boards, or commissions may not, by reason of their executive or administrative powers, exercise judicial authority, or control or interfere with the courts in the exercise by the latter of judicial functions. 16 C.J.S. Constitutional Law § 219 (1984). While the quoted section of the Corpus Juris Secundum goes on to explain that "[executive officers] may investigate and determine facts as an incident to the performance of their administrative functions," judicial discipline is not among the administrative functions of any executive office, but is the province of the Commission, constitutionally created as part of the judicial branch of government.
[T]he power of the judiciary, stemming from the doctrine of separation of powers, must prevail to control its own members. Any decision by the Attorney General's office not to present [matters involving a judge's misconduct] to a grand jury involves a discretionary determination by the executive branch and cannot bind or affect the judicial branch in matters concerning the governance of the judiciary.
Matter of Yaccarino, 101 N.J. 342, 502 A.2d 3, 9 (1985).[4]
The Dissent further declares: "The relationship of the Supreme Court to the Nevada Commission on Judicial Discipline is virtually the same as its relationship to the State Bar Disciplinary Boards and Hearing Panels except that the powers over the Bar are not expressly granted in the Constitution, but are deemed inherent powers." The Dissent's analogy is flawed.
The disciplinary boards and hearing panels of the state bar conduct individual attorney disciplinary proceedings and tender findings and recommendations to this court respecting the imposition of public discipline including the sanctions of suspension and disbarment. If the 1976 amendments to the Nevada Constitution had created a Commission similar to the recommendatory judicial disciplinary systems presently in place in California and other states cited in the Dissenting Opinion, then the comparison with the state bar disciplinary function might have some *929 force. Indeed, the recommendatory systems of judicial discipline in California and many other states have much in common with the procedures that govern attorney discipline in Nevada. For example, pursuant to SCR 105(3)(b), a decision of a hearing panel recommending suspension or disbarment is automatically appealed to the supreme court. Moreover, SCR 102(1) and (2) specifically provide that only the supreme court may order the disbarment or suspension of an attorney. Thus, like a judge facing discipline in a state with a recommendatory system of judicial discipline like California's, an attorney facing discipline under Nevada's attorney discipline system can only be suspended or disbarred from the practice of law by the state's supreme court.
The inescapable fact remains, however, that the 1976 amendments to the Nevada Constitution did not create such a recommendatory system of judicial discipline in this state. Thus, the Dissent's attempt to analogize attorney and judicial discipline procedures is not only insupportable, but somewhat unsettling inasmuch as it sets forth an analysis that appears oblivious to the fundamental structure of both Nevada's attorney and judicial disciplinary procedures.
What the Dissent fails to appreciate is that Petitioner Whitehead is entitled to a judicial discipline proceeding free from the serious conflicts and constitutional improprieties created by the Attorney General's association with the case precisely because the Nevada Commission on Judicial Discipline possesses the broad constitutional power to issue a final decision. Citing to the Commentary to Rule 4 of the 1993 proposed draft of the ABA Model Rules for Judicial Disciplinary Enforcement, the Dissent declares: "[A]lthough the separation of investigatory and prosecutorial functions is desirable, such separation is `not constitutionally mandated.'" The Dissent, however, overlooks the reason why such internal separation of judicial discipline functions of most state commissions is "not constitutionally mandated." As the Report of the ABA Subcommittee recommending the proposed Model Rules also observes, systems of judicial discipline which combine all functions investigation, prosecution, hearing and decision makingin a single process have "survived due process challenges because in this type of system the highest court has the ultimate authority to review de novo and impose sanctions." See Majority Report of Joint Subcommittee on Judicial Discipline on Model Rules for Judicial Disciplinary Enforcement at 3 (August 1994).
As noted above, and as the Attorney General herself has repeatedly emphasized in the instant case, this court decided in Goldman that "the Nevada Constitution does not contemplate this court's de novo or independent review of factual determinations of the commission on appeal." Thus, the analysis set forth in the Dissent fails to appreciate the substantial due process implications arising from the critical distinctions between a "recommendatory" system of judicial discipline, and the system established under the Judicial Article of the Nevada Constitution. Under Nevada's system, where the state's highest court is foreclosed from conducting de novo or independent review of factual findings of the Commission, increased vigilance and careful scrutiny of the procedures employed by the Commission are essential to assure that an accused judge is accorded the fundamental fairness to which he or she is entitled under the Due Process Clause of the Constitution.
The Dissent's analysis also apparently overlooks other crucial distinctions between the state bar's disciplinary panels and the Judicial Discipline Commission. The state bar is emphatically not, as the Dissent points out, an "independent body created ... by the people of the State of Nevada" as a part of the judicial branch of government; it does not draw its power from constitutional enabling provisions. Rather, the state bar is under the exclusive jurisdiction and control of the supreme court. Compare Nev. Const. art. 6, § 21 (constitutional referendum creating Judicial Discipline Commission) with NRS 7.275 (statute continuing state bar as a public corporation under the exclusive jurisdiction and control of the supreme court) and SCR 99 and 103 (Supreme Court Rule creating state bar disciplinary boards and hearing panels within the "exclusive disciplinary jurisdiction of the supreme court").
*930 More importantly, the disciplinary panels of the state bar do not possess the same final, independent authority over attorneys that the Commission possesses over judges. The state bar disciplinary panels have no authority to suspend or disbar attorneys; they merely recommend such discipline to this court, which retains the ultimate power to impose any appropriate sanction. By contrast, and as emphasized above, in the absence of an appeal by the aggrieved judge, the Nevada Judicial Discipline Commission has final, independent authority to censure, remove or retire a judge. Compare Goldman, 108 Nev. at 266, 830 P.2d at 117 (Commission decision to censure, remove or retire is not merely advisory or recommendatory but is of independent force and effect absent perfection of an appeal; constitution does not contemplate this court's de novo or independent review of factual findings of Commission on appeal) with In re Kenick, 100 Nev. 273, 680 P.2d 972 (1984) (Supreme Court Rules cannot be construed to limit supreme court's power to suspend or disbar; court is not bound by the findings and recommendations of the disciplinary board and must examine the record anew and exercise its independent judgment).
The Dissent relies on California and North Carolina precedent for the proposition that "case law indicates that several states have sanctioned the use of state Attorneys General for various functions in judicial discipline cases" (Dissent page 7). See Wenger v. Commission on Judicial Performance, 29 Cal.3d 615, 175 Cal.Rptr. 420, 422 n. 3, 630 P.2d 954, 956 n. 3 (1981); Spruance v. Commission on Judicial Qualifications, 13 Cal.3d 778, 119 Cal.Rptr. 841, 844 n. 5, 532 P.2d 1209, 1212-13 n. 5 (1975); In re Hardy, 294 N.C. 90, 240 S.E.2d 367 (1978); In re Stuhl, 292 N.C. 379, 233 S.E.2d 562 (1977). The Dissent's reliance on the cited cases is misplaced because: (1) the separation of powers issue was simply not raised or addressed; (2) the attorneys general involved in these cases were not performing the kinds of multiple roles seen in this case; and (3) unlike Nevada, the systems of judicial discipline applicable in these jurisdictions are "recommendation" systems in which the state's highest court has the ultimate authority to review commission decisions de novo and impose sanctions.
More specifically, the Dissent cites Wenger and Spruance as examples of instances where attorneys general acted in multiple capacities during judicial discipline proceedings, assuming the roles of examiners, investigators, prosecutors and counsel to the commissions on appeal or in proceedings attacking the legal correctness of the commissions' actions. In Wenger and Spruance, however, it is clear that it is the California Supreme Court, and not the California Commission, which makes the final decision to censure, retire or remove the accused judge, although this power is contingent upon the recommendation of the Commission. In Nevada, by contrast, the Commission may itself order the censure, removal or retirement of a judge (ARJD 30(2)); the judge may then appeal this final decision to this court. Consequently, even though an attorney general may be utilized in California as the Dissent contends, the conflicts of interest created by an attorney general's acting in multiple roles are far more significant in Nevada where, unlike California, the attorney general has been serving as an investigator, a prosecutor, and as counsel for the very tribunal empowered to issue a final decision respecting judicial misconduct. As the Spruance opinion notes, the California Commission appears before the California Supreme Court, the final arbiter of all judicial discipline, in an adversarial role, and the examinerswhich may be attorneys generalappear "merely as counsel to [the] respondent" Commission. Further, although the Wenger and Spruance opinions show that an examiner, who may be an attorney general, may act as a presenter of evidence before the Commission, and as counsel for the Commission before the California Supreme Court, the opinions do not provide specific support for the proposition that deputy attorneys general may act in these two roles at the same time.
A similar analysis applies to the two North Carolina cases cited in the Dissent. See In re Hardy, 294 N.C. 90, 240 S.E.2d 367 (1978); In re Stuhl, 292 N.C. 379, 233 S.E.2d 562 (1977). In Hardy, a deputy attorney general was utilized to present charges to a judicial *931 discipline commission. In Stuhl, a deputy attorney general represented the judicial discipline commission in an adversary proceeding. However, a careful reading of these cases reveals that North Carolina follows the same scheme to which California adheres, namely, the judicial discipline commission in the cited cases merely recommends discipline, and the actual order to discipline is entered by the state supreme court. Thus, the cases are not applicable to the instant case for the same reasons discussed above.
The Dissent also protests that no actual conflicts of interest have been established or identified as a result of the Attorney General's staff having acted as investigator, prosecutor, legal counsel to the Commission, and appellate advocate for the Commission in this matter. The Dissent perceives no evidence contradicting the averments of Special Deputy Attorney General Campbell and Assistant Attorney General Nielsen that Campbell was not in any way connected with or beholden to the Attorney General's Office. Much more than a mere "fanciful scenario," however, supports the Majority's conclusions. For example, a cursory review of the Commission's minutes, Campbell's billings, and the affidavits, statements, and exhibits discloses that Campbell was deputized as a member of the Attorney General's staff, is contractually bound to serve "at the pleasure of the Attorney General" and is contractually bound to "report regularly to the Attorney General concerning the status of [this] case." See Whitehead v. Comm'n on Jud. Discipline, 110 Nev. ___, ___, 873 P.2d 946, 954 (1994).
The Dissent also brands as "mere speculation" the Majority's concern that the Attorney General's office could present cases before the very judges her office is investigating or supervising.[5] The case of Judge D___, however, outlined in the Majority Opinion in Whitehead II, presents precisely such a scenario. Judge D___ was placed under the supervision of the Attorney General's office which had the power to conduct ongoing "follow-up examinations" including contacting witnesses. Id., 110 Nev. at ___, 873 P.2d at 970. This ad hoc probationary scheme obviously creates at a minimum the appearance of impropriety, if not an inference of actual bias.
The Pennsylvania Supreme Court was faced with a similar situation. See In Interest of McFall, 533 Pa. 24, 617 A.2d 707 (1992). McFall involved appeals by some twenty-nine criminal defendants who charged that they had been denied their right to a fair and impartial tribunal because the judge who presided over their trials was assisting in an FBI investigation. Id. 617 A.2d at 711. The FBI had previously caught the judge accepting a monetary gift from a potential litigant and had obtained the judge's cooperation in its investigation by promising to tell any other investigating or prosecuting body of the judge's full cooperation. Id. The Pennsylvania Supreme Court affirmed the intermediate appellate court's order granting all twenty-nine criminal defendants a new trial because the defendants' "rights to an impartial tribunal [had] been trampled upon" and because the court concluded "that the appearance of impropriety compels us to affirm the grant of new proceedings in view of the blatant potential conflict of interest of the trial judge." Id. at 712. The court went on to note "[o]ne could reasonably conclude that, under the circumstances, [the judge]'s cooperation with the United States Attorney's office cast her in the role of a confederate of the prosecutors in the appellees' cases." Id. at 713.
Although the Dissent perceives this type of potential conflict of interest to be a mere "specter," it should be noted that there are two motions in criminal cases currently pending before this court in which the appellants seek to discover whether Judge D___ or any other judge who is or has been subject to informal probation under the supervision of *932 the Attorney General's office presided over any portion of their criminal trials. Obviously if these appellants were prosecuted by the Attorney General's office before judges like Judge D___ who were simultaneously being "supervised" by the Attorney General's officethis court would have to consider whether those appellants, like the appellants in the McFall case, were denied a fair and impartial tribunal. The instant Majority Opinion seeks to avoid having this court placed in the unenviable position that the Pennsylvania Supreme Court found itself, i.e., having to order new proceedings in dozens of criminal cases because of the appearance that the judge who presided over those cases might be beholden to the prosecution.
Finally, the Dissent raises First Amendment concerns as a kind of all-purpose panacea against the Majority's desire to appoint a special master to investigate the cause of leaks of confidential information in derogation of Petitioner's constitutional rights. Although this expression of concern with the First Amendment might be an effective strategy for swaying public opinion, it has no legitimate legal basis.
Put quite simply, the First Amendment does not stand for the proposition that one who is under a duty not to reveal confidential information may breach this duty with impunity. See, e.g., Landmark Communication, Inc. v. Virginia, 435 U.S. 829, 837 n. 9, 98 S.Ct. 1535, 1540 n. 9, 56 L.Ed.2d 1 (1978) (statute imposing criminal liability for breach of confidential judicial discipline proceedings might well be constitutional under the First Amendment if it is applicable only to direct participants in a judicial discipline inquiry); United States v. Richey, 924 F.2d 857 (9th Cir.1991) (government may properly limit speech when compelling government interests out-weigh free expression interests of speaker); Kamasinski v. Judicial Review Council, 797 F.Supp. 1083 (D.Conn.1992) (state's interest in prohibiting disclosure prior to determination of probable cause is sufficiently compelling to survive the strictest First Amendment scrutiny).[6]
Moreover, a duty of confidentiality can be lawfully imposed and enforced where a breach of confidentiality is in derogation of the constitutional rights of the party meant to be protected thereby. As the United States Supreme Court stated in Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522-23, 16 L.Ed.2d 600 (1966):
The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.[[7]]
(Emphasis added.)
If collaboration between counsel and the press is "subject to regulation ... highly censurable and worthy of disciplinary measures" how much more would collaboration between a sitting judge and the press be worthy of such censure? Whitehead I ruled that the Judicial Discipline Commission constitutes a "Court of Judicial Performance and *933 Qualifications" (despite the Dissent's objection to this ruling, it is obvious, given the Commission's authority to issue a final order censuring, removing or retiring a judge, that the Commission members are very real "judges" over petitioner). I need not belabor the obvious point that a judge, by virtue of his or her office, is prohibited from exercising certain First Amendment rights otherwise enjoyed by the general citizenry, namely, the right to comment on a pending case, even though that case may clearly implicate matters of great public concern. See Nevada Code of Judicial Conduct, Canon 3B, § 9. Judges are certainly not entitled to divulge confidential information learned in the course of their official duties; and they may be subject to disqualification, at the very least, for making public statements indicative of bias against a litigant.
In this regard, it must be remembered that the tone and effect of the news coverage of this matter has clearly been indicative of hostility towards Petitioner on the part of whomever made the leaks to the press. If such party is a member of the Judicial Discipline Commission who will sit in judgment over Petitioner, it cannot be expected that Petitioner will be given a fair hearing. Accordingly, the appointment of a master is necessary to protect Petitioner's constitutional rights to an impartial tribunal.

ATTORNEY GENERAL DEL PAPA'S DISQUALIFYING MISCONDUCT IN THIS CASE
Even if the Dissent were correct in saying that there are no constitutional or conflict-of-interest bars to the Attorney General's continuing to act in the role of legal advisor and prosecutor in this case, I believe that there is another independent basis for disqualification of Attorney General Del Papa in the Whitehead case. Attorney General Del Papa should not be permitted to act as counsel in any capacity in this case, because she has displayed such animus, such a publicly-proclaimed antipathy toward the "defendant" judge in this case that she has rendered herself and her office unsuitable and incapacitated to serve as a prosecutorial advocate in the judicial discipline case involving Judge Whitehead. The Attorney General appears to have forgotten that her "primary duty is not to convict, but to see that justice is done" and that "cases must be tried in the courtroom rather than in the media." Williams v. State, 103 Nev. 106, 110, 111, 734 P.2d 700, 703 (citations omitted). The Attorney General's running public comments on this case display a continuous effort to influence public opinion against Judge Whitehead. Not only is this conduct ethically unacceptable, it is in direct violation of ARJD 8.[8] ARJD 8 is a very clear and explicit court rule which has been flouted by the Attorney General. This rule expressly commands that all counsel in judicial discipline matters, "at all times," refrain from engaging in "any private or public discussion" which relates to the merits of any judicial discipline matter or which might "prejudice a [judge's] reputation or rights to due process." (Emphasis added.)
For most of the time that this case has been pending the Attorney General has been engaging in "public discussion[s]" of one kind or another about the case, saying over and over again that Judge Whitehead was charged with "serious misconduct" and issuing public statements that rather clearly violate ARJD 8. Rather than attempting to catalogue the various violations of ARJD 8, I will rely in making my point on one very obvious and, may I say, flagrant example of the manner in which Attorney General Del Papa has defied this court rule. The Attorney General's press release of January 31, 1994, epitomizes her refusal to abide by the rules. In this statewide press release, issued to all public news media sources, the Attorney General publicly accuses the judge of lying ("misrepresentation"), slander ("smearing others") and tampering with the justice system ("going around and above the law").[9] *934 The Attorney General has waged a public opinion war against Judge Whitehead and in public statements and press releases has repeatedly attempted to "try her case" in the media. The January 31 release is probably the worst and most undeniable example of the Attorney General's misconduct.
Presumably the Attorney General is aware of the contents of ARJD 8 and aware that she is obliged to refrain from such "public... discussion[s]" and that she must not do or say anything that will "prejudice a [judge's] reputation or rights to due process." Can anyone doubt that publicly calling a judge a liar or slanderer or publicly accusing a judge of going "around and above the law" does not "prejudice" the judge's reputationespecially when such statements go to every news source in the state and are made by none other than the Attorney General of the State of Nevada? Can anyone doubt that Judge Whitehead's "due process rights" before the Commission have not been damaged by the Attorney General's conduct? It may be that notwithstanding the history of this case there is some possibility that Judge Whitehead might somehow be afforded due process in the future, I do not know; but one thing is clear and that is that, given the damage that Attorney General Del Papa has done to Judge Whitehead's reputation and the prejudicial effect that damage necessarily has had on Judge Whitehead's due process rights, we cannot, entirely apart from any consideration of constitutional incapacity or conflict of interest, allow Attorney General Del Papa to continue to act in any capacity in this case. The Attorney General's misconduct, by itself, and independent of the two grounds stated in the Majority Opinion, requires that she be removed from any contact with this case at once.
In Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982), we recognized that the "disqualification of a prosecutor's office rests with the sound discretion of the district court" and that "[i]n exercising that discretion, [the court] should consider all the facts and circumstances and determine whether the prosecutorial function could be carried out impartially...." Id. at 309-10, 646 P.2d at 1220 (citations omitted). I cannot imagine how the Attorney General, who has also been acting as both Judge Whitehead's prosecutor and the Judicial Commission's legal counsel, can, given the pattern of her manner of handling this case and the inexcusable issuance of the press release of January 31, 1994, possibly be able to carry out the prosecutorial function "impartially" in this case. I do not see how it can be denied that the Attorney General is clearly unable to act "impartially" with regard to a man whom she called "desperate" and whom she has publicly branded as a liar and slanderer who is trying to escape his just deserts by going "around and above the law." In my opinion, her flagrant violation of court rules, her public comments on a pending judicial discipline case, and her prejudicial public statements against Judge Whitehead all combine to deny Judge Whitehead any possibility of receiving fair treatment and due process for so long as Attorney General Del Papa, her staff or her special prosecutor have anything to do with this case. I would disqualify her on this ground alone.
I am not ready at this time to pass judgment on what penalties should be meted out as a result of the Attorney General's flouting of ARJD 8, but I am convinced that her actions relative to this case disqualify her from proceeding another day as the prosecutor or in any other capacity on this case.
SHEARING, Justice, dissenting:
I do not agree that the Attorney General, the Assistant Attorney General or the special counsel hired by the Nevada Commission on Judicial Discipline should be disqualified from appearing in this proceeding or any disciplinary proceeding now pending before the Commission. The grounds which the majority and the concurrence allege require the disqualification of the Attorney General are (1) violation of the separation of powers doctrine, (2) conflicts of interest and (3) misconduct amounting to violation of due process. None of these grounds is supported in law or fact.

*935 SEPARATION OF POWERS

There is no basis in the Nevada Constitution, the Nevada statutes or the rules adopted by this court for holding that the Nevada Commission on Judicial Discipline lacks the authority to seek the assistance of the Attorney General's office for legal advice and representation. On the contrary, the Commission is specifically authorized to do so. The legislature enacted NRS 1.450(2) directing the Attorney General to provide, upon request of the Judicial Discipline Commission, legal counsel in any investigation or proceeding of the Commission. The majority would have this statute declared unconstitutional in violation of the doctrine of separation of powers.
Article 3, Section 1 of the Constitution of the State of Nevada provides:
Three separate departments; separation of powers. The powers of the Government of the State of Nevada shall be divided into three separate departments, the Legislative,the Executive and the Judicial; and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in the cases herein expressly directed or permitted.
There is no dispute that Nevada has adopted the traditional separation of powers doctrine which provides the checks and balances necessary to prevent any one branch of government from becoming all-powerful and tyrannical. Each branch has the exclusive authority to exercise the powers delegated to it. Legislative power is the power to set the policies of the state through its enactments and the allocation of funds. See Galloway v. Truesdell, 83 Nev. 13, 20, 422 P.2d 237, 242 (1967). Executive power is the power to enforce and implement the policies of the state as set forth by the legislature. Id. Judicial power is the power to interpret legislation, to hear and determine justiciable controversies and to enforce any valid judgment, decree or order. Id.
This does not mean that there is a wall between any of the branches preventing them from interacting. On the contrary, the structure of government is such that the branches must interact. That is what keeps any one branch from dominating the government. In The Federalist No. 47, responding to criticism that there was not sufficient separation of powers in the proposed federal constitution, James Madison stated:
If we look into the constitutions of the several States, we find that, notwithstanding the emphatical and, in some instances, the unqualified terms in which this axiom [separation of powers] has been laid down, there is not a single instance in which the several departments of power have been kept absolutely separate and distinct.
More recently, the United States Supreme Court has stated, in Morrison v. Olson, that
[T]he system of separated powers and checks and balances established in the Constitution was regarded by the Framers as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." We have not hesitated to invalidate provisions of law which violate this principle. On the other hand, we have never held that the Constitution requires that the three branches of Government "operate with absolute independence." In the often-quoted words of Justice Jackson:
"While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."
487 U.S. 654, 693-94, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988) (citations omitted).
And in Buckley v. Valeo, the United States Supreme Court stated:
[I]t is also clear from the provisions of the Constitution itself, and from the Federalist Papers, that the Constitution by no means contemplates total separation of each of these three essential branches of Government.... The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing *936 off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.
424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1975) (per curiam).
Neither does the doctrine of separation of powers mean that the legislature or the constitution may not assign fact-finding functions in disputes to agencies in branches of government other than the judiciary. There are numerous state agencies which perform quasi-judicial functions, agencies such as the State Industrial Insurance System, the Board of Medical Examiners, Board of Parole Commissioners and Real Estate Commission, to name a few. The adjudicatory decisions made by these agencies affect the fundamental rights of individuals, and absent an appeal to the courts, are final, with the full force and effect of law. The majority states "A member of the executive branch is simply not constitutionally permitted to act in a judicial capacity." Fortunately, the majority is wrong. If the majority's implication that agency adjudication violates the separation of powers doctrine were correct, the overwhelming majority of government would be unconstitutional.
It has long been settled that the exercise of duties that are judicial in nature is not necessarily an exercise of the judicial power of the state and therefore does not violate the separation of powers doctrine. In Sawyer v. Dooley, 21 Nev. 390, 396, 32 P. 437, 439 (1893), this court stated regarding Article 3, Section 1 of the Nevada Constitution:
These departments are each charged by other parts of the constitution with certain duties and functions, and it is to these that the prohibition just quoted refers. For instance, the governor or the judiciary shall not be members of the legislature, nor shall they make the laws under which we must live. But this is quite a different thing from saying that no member of the executive or judicial departments shall exercise powers in their nature legislative, but which are not particularly charged by the constitution upon the legislative department; such as where the board of commissioners for the insane makes rules for the management of the asylum, or a court establishes rules for the transaction of the business coming before it. It would be impossible to administer the state government were the officers not permitted and required, in many instances, to discharge duties in their nature judicial, in that they must exercise judgment and discretion in determining the facts concerning which they are called upon to act, and in construing the laws applicable to them. Hence we see no constitutional objection to members of the executive branch being charged with the duty of assessing property, or of acting upon the board of equalization, for neither of these functions have been, either expressly or impliedly, placed by the constitution upon either of the other departments; for certainly, although in equalizing valuations a board may act in a judicial capacity, the constitution nowhere contemplates that the judicial department, as organized by article 6, shall discharge that duty.
Thus, it is clear that not every exercise of a function judicial in nature constitutes an exercise of judicial power, which power the constitution states is not to be performed by other branches of government. In Bergman v. Kearney, 241 F. 884, 898 (D.Nev.1917), the court stated: "Judicial power, in the constitutional sense, is something more than authority to hear and determine; it includes the power to decide finally and conclusively, and also power to carry its determination into effect." This power does not rest in any agency or commission, unless the agency or commission or the party before it, agrees to accept the result with resort to the courts. The Nevada Constitution makes clear that the judicial power of this state rests exclusively in the courts. Article 6, Section 1 states:
Judicial power vested in court system. The Judicial power of this State shall be vested in a court system, comprising a Supreme Court, District Courts, and Justices of the Peace. The Legislature may also establish, as part of the system, Courts for municipal purposes only in incorporated cities and towns.
*937 What is now Article 6, Section 21 of the Nevada Constitution, entitled Commission on Judicial Discipline, began as a proposed Constitutional amendment in the 1973 legislature. Following the procedure for constitutional amendment established by Article 16 of the Nevada Constitution, the elected representatives of the state voted in 1973 and again in 1975 in favor of the proposed amendment. Finally, in November of 1976 the amendment was ratified by direct vote of the people.
Prior to 1976 the people of Nevada had no effective remedy for judicial misconduct falling short of criminal behavior. The traditional checks and balances in our constitutional organization were not adequate to curb the abuses of power by members of the judicial branch. Judicial misconduct was, by and large, entirely beyond the jurisdiction of the executive branch, the legislative branch and all existing administrative agencies. Only the justices of the Supreme Court could impose discipline on judges of the state.
That the people of Nevada believed that the Supreme Court had not, and could not, effectively police judicial misconduct is not surprising. Judges and justices, following their constitutional mandate, hear and determine questions in controversy that are properly brought before them. See Galloway v. Truesdell, 83 Nev. 13, 20, 422 P.2d 237, 242 (1967). In carrying out their duties, judges, unlike legislators and especially unlike executive branch officials, do not ordinarily have occasion to investigate complaints of misconduct, much less to prosecute after determining that the complaints have merit. In striking down a statute which placed the judges in a position of investigator, this court warned, "Centuries of common law tradition warn us with echoing impressiveness that this is not a judge's work." 83 Nev. at 29, 422 P.2d at 248.
Furthermore, in a small state like Nevada, the justices and judges usually know one another personally. Thus, except in the case of the rare errant judge without strong personal ties of friendship with the judicial community, it was nearly psychologically impossible for the justices to adopt, on their own initiative, the role of investigator and prosecutor of judicial misconduct. The result was a dissatisfied public and the adoption of Article 6, Section 21 of the Nevada Constitution.
In adopting and ratifying Article 6, Section 21, the people of Nevada clearly intended to remove the power and responsibility for disciplining noncriminal judicial misconduct from the judiciary. In so doing, they clearly intended to leave the judiciary with less power and greater accountability. The one difference in the Nevada Commission on Judicial Discipline from most other agencies is that it was designed to have greater independence. The members are not selected by any one branch of government. The Governor appoints three members, the Supreme Court appoints two members and the Board of Governors of the State Bar appoints two members. In addition, if the state bar ceases to exist as a public corporation, the legislature must determine how the attorney members are appointed.
In the Whitehead opinions issued thus far, the majority of this court argues that this could not have been the intent of the people because the provision creating the Judicial Discipline Commission was placed in Article 6 of the Nevada Constitution entitled "Judicial Department." Therefore, according to the majority's reasoning, because of the provision's placement and because the Commission also has some "quasi-judicial" powers, the Commission must be a court exercising the judicial power vested in the court system by Article 6, Section 1.
This analysis does not survive a careful review of Article 6, which contains twenty-one sections ranging in title from "Judicial Power vested in court system" to "One form of civil action" to "Fees or perquisites of judicial officers." First, when the voters added section 21 to the Constitution, Section 1 of Article 6, which vests the judicial power in the courts, was not amended to include the Judicial Discipline Commission in the list of courts authorized to exercise the judicial power of the state. This should be dispositive of the issue.
Furthermore, the contents of the other sections make clear that not all powers created in Article 6 relate to the exercise of *938 judicial power. What the twenty-one sections have in common is that each section impacts in some way on the judicial branch of government. For example, Section 15 grants power to the legislature to fix the salaries of state judges and justices. It makes no more sense to state that the Judicial Discipline Commission is part of the judicial branch of government because it receives its powers from a section placed in Article 6 than it does to say that the legislature is part of the judicial branch of government because it too is the recipient of powers granted by a section of Article 6. Constitutional law does not depend upon principles of legislative indexing.
This court has recognized that the attorneys of this state are an integral part of Article 6. Such recognition is embodied in Supreme Court Rule 39, which provides:
Inherent powers of courts. Attorneys being court officers and essential aids in the administration of justice, the government of the legal profession is a judicial function. Authority to admit to practice and to discipline is inherent and exclusive in the courts. The supreme court rules set forth in this Part III are the exclusive rules for the governing of the legal profession in Nevada.
Yet no one has suggested that because attorneys are officers of the court, they are part of the judicial branch and are therefore disqualified from representing or serving in the executive or legislative branches of government.
The judicial power, for constitutional purposes, can be found where it was placed by Article 6, Section 1 when the Nevada Constitution was ratified in 1864: in a "court system, comprising a Supreme Court, District Courts, and Justices of the Peace...."
Justice Springer, in his concurring opinion, offers another reason why he believes that Article 6, Section 21 must be interpreted as placing the Judicial Discipline Commission in the judicial branch of government: if it were not so read, Article 6, Section 21 would violate the separation of powers clause, and thus, by implication, be unconstitutional. In support of this proposition, Justice Springer cites Dunphy v. Sheehan, 92 Nev. 259, 266, 549 P.2d 332, 336-37 (1976).
There are at least three problems with this analysis. First, it is an oxymoron to state that a duly-ratified constitutional amendment can, at the time of its passage, violate that same constitution. It is one of the best-established principles of constitutional interpretation that in the case of a clear conflict between a constitutional amendment and another constitutional provision already existing at the time the amendment is ratified, the amendment, being the later expression of will of the lawmaker, must prevail. Schick v. United States, 195 U.S. 65, 68-69, 24 S.Ct. 826, 826-27, 49 L.Ed. 99 (1904). Thus, had the language of Section 21 placed the Judicial Discipline Commission entirely within the executive or legislative branch, neither Article 3, Section 1, nor any then-existing constitutional provision could be held to invalidate the new amendment.
Second, the court in Dunphy merely stated, in dicta no less, that the promulgation of a Code of Judicial Ethics, not the enforcement of such a code, is "within the inherent power of the judicial department of this state." 92 Nev. at 266, 549 P.2d at 336-37 (1976). Since promulgation of the Code of Judicial Ethics remains today in the judicial branch of government, the decision is irrelevant regarding the creation of the Judicial Discipline Commission.
Finally, the Dunphy case was decided April 29, 1976, several months before Article 6, Section 21 was ratified in the November 1976 elections. Thus, even if Dunphy could be read to immunize the judiciary from judicial disciplinary proceedings from non-judicial bodies, the case would have been explicitly overruled by the voters as of November 1976.
Justice Springer also seems to believe that there is an inconsistency between the view that the Commission does not exercise the judicial powers of the State and the opinion in Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992). There is no inconsistency whatsoever. The issue in Goldman was the scope of review, not whether judicial power rested in the Commission, and not whether the Commission *939 was a "Court of Judicial Performance and Qualifications." Goldman held that this court must accord Commission findings a deferential standard of review. This is no different than the deference this court must grant other state agencies by statute. See NRS 233B.135.[1] Additionally, there is no dispute that the Commission has broad power to discipline judges and that its orders are final unless appealed to this court. The same is true of most state agencies. Thus, Justice Springer's discussion regarding Commissioners in other states and the fact that they only have power to make recommendations to the court rather than have final decision-making power is irrelevant to the instant case.
Specifically, Goldman does not support the sweeping proposition for which it is cited in Whitehead I that "the Commission is not to be regarded merely as an administrative agency but as a true `Court of Judicial Performance and Qualifications.'" Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 161 n. 25, 869 P.2d 795, 816 n. 25 (1994). As stated, this court in Goldman merely held that the Judicial Discipline Commission is accorded the same deferential standard of review as any other state agency.
Since the Judicial Discipline Commission does not exercise the judicial power of the state, certainly the Commission's attorney would not be exercising that power, even if providing legal advice could properly be equated with serving as an "ex facto member of the Commission."
Furthermore, it can be stated as a general rule that the attorney providing legal advice does not take on the character, for constitutional separation of powers purposes, of the client being served. That is why the legislature could, without violating the constitution, order the Attorney General to represent any and all government officers, officials, agencies and even judges and legislators. See NRS 41.0339. In all branches of government, decision makers, and not their legal advisors, take responsibility for the decisions they make. Contrary to the majority's implication, there is nothing sinister about the Commission making decisions either consistent or inconsistent with the advice of an attorney from the Office of the Attorney General.

CONFLICTS OF INTEREST
The majority of this court also holds that the Attorney General is disqualified from representing the Commission because of conflicts of interest. The majority does not make clear under which constitutional provision it finds a conflict of interest which operates to nullify NRS 1.450(2). Some of the majority's language suggests that the institutional position of the Attorney General is so rife with conflicts of interest with respect to the judicial branch of government that providing legal advice to the Commission violates the separation of powers clause. Other language suggests that in some way the petitioner's due process rights will be violated if the Attorney General represents the Commission. Both contentions rest, not on any actual conflict of interest evidenced in the instant case, but on specters of potential conflicts and misuses of power, as well as criminal activity.
*940 The general rule regarding conflicts of interests for attorneys is stated in Supreme Court Rule 157, which provides as follows:
Rule 157. Conflict of interest; General rule.
1. A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(a) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(b) Each client consents, preferably in writing, after consultation.
2. A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(a) The lawyer reasonably believes the representation will not be adversely affected; and
(b) The client consents, preferably in writing, after consultation.
When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
This rule would have some bearing on the majority's allegation that there is a conflict arising from the fact that the Attorney General is official counsel for the judges and justices of the state. In the event that a judge involved in disciplinary proceedings were in need of legal services, it is quite possible that the Attorney General would not be able to form a reasonable belief that the representation would not be adversely affected, mandating disqualification under SCR 157. The solution to this conflict, which can hardly be characterized as one of constitutional dimension, is simple and straightforward. Under NRS 41.03435, the Attorney General would, with the approval of the State Board of Examiners, employ an attorney from the private sector to act as special counsel for the judge or justice.
Supreme Court Rule 157 does not apply to disqualify the Attorney General from providing legal advice to the Commission under any of the conflicts of interest alleged by the majority. Yet, despite the absence of a constitutional violation, the majority would nullify an act of the legislature directing the Attorney General to represent the Commission on the basis of hypothetical conflicts. This court has no general authority to strike down an act of the legislature merely because it sees potential or actual conflicts of interest. In State of Nevada v. Doron, 5 Nev. 399 (1870) this court stated:
[E]very statute is to be upheld, unless plainly and without reasonable doubt in conflict with the constitution; [and] the legislature has power to pass any law, not positively prohibited, or by clear implication forbidden by the constitution....
Both Judge Guy in his concurrence in Whitehead I and the majority in this opinion rest their arguments on the assumption that Attorneys General will be unable to resist the temptation to engage in misconduct with respect to judges. The implication is that allowing NRS 1.450(2) to function as it has since it was enacted by the legislature in 1977 will inevitably lead to an epidemic of politically-motivated persecutions of judges. This fanciful scenario may be possible, but does not warrant legal action unless there is some actual evidence of its occurring. Government operates on the principle that its officers and employees are persons of good will and honesty who not only follow the law, but their professional ethical obligations. We have been presented with no evidence that the executive officials have not been acting with professional integrity and ethics.
The majority view also ignores the very powerful disincentives to such conduct. An Attorney General or any attorney on the Attorney General's staff who initiated a prosecution motivated by "personal, partisan or political gain," or who attempted to hold a judge "hostage" to affect the outcome of a case, would be subject to prosecution under one or more of the following criminal statutes:

*941
NRS 197.110 Misconduct of public officer  a
 gross misdemeanor
NRS 197.170 Extortion of public officer  a felony
NRS 197.200(2)(b) Oppression under color of office 
 a gross misdemeanor
NRS 199.300(1)(b) Intimidating public officer, public
 employee, juror, referee, arbitrator,
 appraiser, assessor or similar
 person  a gross misdemeanor
NRS 199.310 Malicious prosecution  a felony or
 misdemeanor
NRS 199.320 Inducing lawsuit  a misdemeanor
NRS 200.510 Criminal libel  a gross misdemeanor
NRS 200.560 Threatening to publish libel  a
 gross misdemeanor
NRS 205.320 Extortion  a felony
(4) & (5)

If criminal prosecution were not enough of a deterrent, the violator could also be charged with the violation of SCR 101, 174, 179, 181, 201 and 203, which, if found to be true, would almost certainly lead to disbarment under SCR 102. The law is well-equipped to deal with the extreme conduct that the majority seems to believe NRS 1.450(2) makes imminent.
The majority's argument, however, suffers from a more serious defect than the fear being out of proportion to the danger. The argument contains no limiting principle. It could be said of every district attorney in Nevada that he or she has the power to bring about prosecution of judges, of legislators and of private citizens for political reasons or to influence decisions. In fact, all government officials with significant power, including judges and justices, are in a position to attempt to abuse that power if they are so inclined. That does not justify this court in prohibiting, as a prophylactic measure, an official from executing the functions assigned to it by law. On the contrary, even if there are public officials who have abused their powers, they could only be kept from their assigned duties after procedures which ensure that the officials have received due process of law.
The majority would do well to heed the words of Justice Frankfurter in his concurrence in In Re Groban's Petition, 352 U.S. 330, 335-37, 77 S.Ct. 510, 514-15, 1 L.Ed.2d 376 (1957):
To whatever extent history may confirm Lord Acton's dictum that power tends to corrupt, such a doctrine of fear can hardly serve as a test, under the Due Process Clause of the Fourteenth Amendment, of a particular exercise of a State's legislative power. And so, the constitutionality of a particular statute, expressive of a State's view of desirable policy for dealing with one of the rudimentary concerns of societythe prevention of fires and the ascertainment of their causesand directed towards a particular situation, cannot be determined by deriving a troupe of hobgoblins from the assumption that such a particularized exercise of power would justify an unlimited, abusive exercise of power.
....
We are admonished from time to time not to adjudicate on the basis of fear of foreign totalitarianism. Equally so should we not be guided in the exercise of our reviewing power over legislation by fear of totalitarianism in our own country.
It is disingenuous for the majority to suggest that it is a conflict for the Attorney General to be privy to confidential information regarding judges and justices by virtue of representation of the Nevada Commission on Judicial Discipline while the Attorney General is not only free, but obligated, under NRS 41.0338, to represent judges in legal proceedings. The very same considerations apply in either scenario. When the Attorney General's office represents judges and justices in litigation, the deputies assigned are also in a position to learn privileged and confidential information. The specter presented of judges held "hostage" and basically *942 subjected to extortion or blackmail is possible, but the mere speculation that such could occur is no basis for disqualification. A judge is conceivably subject to being held "hostage" and subject to extortion or blackmail by anyonean attorney, a litigant, a family member or a total stranger.
When similar arguments were raised in the federal courts against allowing the Attorney General to prosecute judges criminally, the Eleventh Circuit Court of Appeals replied as follows:
[The judge] contends that the courts would be subject to intolerable pressure from the executive if executive officers were allowed to prosecute active federal judges for acts involving the exercise of their judicial power.
Appellant is of course correct that the independence of the judiciary from external pressures is a highly valued element of our constitutional system. That independence is already protected by specific provisions in the Constitution.... Additionally, judges enjoy the same protection as do all citizens from vindictive prosecution by officers of the executive branch. We are not persuaded that the proposed rule of absolute judicial immunity from federal criminal prosecution is a necessary complement to the Constitution's explicit protections. Indeed, the miniscule increment in judicial independence that might be derived from the proposed rule would be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law.
(Citations and footnotes omitted). In the instant case, the hypothetical potential for abuses must also give way to the competing interest of assuring effective means of preventing abuse of judicial power.
In addition, the alleged conflict between giving legal advice to the Commission and also acting as prosecutor before the Commission has long since been resolved by this court. In Laman v. Nevada R.E. Adv. Commission, 95 Nev. 50, 56-57, 589 P.2d 166, 170 (1979), this court stated:
Appellant contends that there was an improper commingling of judicial and prosecutorial functions during the Commission proceedings in that a Deputy Attorney General participated by advising the Commission on evidentiary matters, while his subordinate in the same office was engaged in prosecuting appellant. This contention, unsupported by case authority, is adequately answered by this court's ruling in Rudin v. Nevada Real Estate Advisory Commission, supra, 86 Nev. [562] at 565, 471 P.2d [658] at 660 [1970]:
It is not uncommon in administrative law to find the combination of investigating, prosecuting and judging functions. As a general proposition, such a combination, standing alone, does not constitute a denial of due process. 2 Davis, Administrative Law Treatise § 13.02. Such combination of functions possesses the potential for unfairness, but unfairness is not its inevitable consequence. In the matter at hand that combination did not exist. The investigation was conducted by investigators, the prosecution, by counsel for the Commission, and the decision was made by the Commission itself. There is nothing to suggest that the prosecutor decided the case.
To the extent that federal due process is said to be implicated, even if we assume that the Attorney General performed the roles of investigator, prosecutor, legal advisor and even adjudicator in this case,[2] the United States Supreme Court has answered clearly. In Withrow v. Larkin, 421 U.S. 35, 47-53, 95 S.Ct. 1456, 1464-68, 43 L.Ed.2d 712 (1975), the court stated:
The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring *943 investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.
Very similar claims have been squarely rejected in prior decisions of this Court.
....
More recently we have sustained against due process objection a system in which a Social Security examiner has responsibility for developing the facts and making a decision as to disability claims, and observed that the challenge to this combination of functions "assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity." Richardson v. Perales, 402 U.S. 389, 410 [91 S.Ct. 1420, 1432, 28 L.Ed.2d 842] (1971).
That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate. The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative processes have made any one solution highly unlikely. Within the Federal Government itself, Congress has addressed the issue in several different ways, providing for varying degrees of separation from complete separation of functions to virtually none at all. For the generality of agencies, Congress has been content with § 5 of the Administrative Procedure Act, 5 U.S.C. § 554(d), which provides that no employee engaged in investigating or prosecuting may also participate or advise in the adjudicating function, but which also expressly exempts from this prohibition "the agency or a member or members of the body comprising the agency."
It is not surprising, therefore, to find that "[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process...." 2 K. Davis, Administrative Law Treatise § 13.02, p. 175 (1958). Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating. The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle.
(Footnotes omitted.)
Because Withrow, like other United States Supreme Court precedent on federal due process, is controlling on the courts of all fifty states, it is not surprising that not one of the different procedures used for judicial disciplinary proceedings in the 50 states, including all that use the Attorney General for various functions, has ever been struck down as unconstitutional on due process grounds.
The majority regards Special Counsel Don Campbell as an "attache" or "functionary" of the Attorney General based on (1) the title "special deputy attorney general" given to Campbell after he agreed to serve on the case and (2) the March 25, 1993, contract between the State of Nevada, acting by and through the Attorney General, and Donald J. Campbell & Associates. The conclusion drawn by the majority is that Campbell's position is indistinguishable from that of a full-time salaried employee of the Office of the Attorney General. This conclusion elevates form over substance. The contract with Campbell is clearly a form contract used in any case requiring appointment of special counsel under the terms of NRS 41.03435. The majority in Whitehead II stated that "[t]his court will recognize a document for what it is, rather than the name associated with it." Whitehead v. Comm'n on Jud. Discipline, 110 Nev. ___, ___, 873 P.2d 946, 961 (1994). Following this wisdom, it is clear that the form contract tells little, if anything, about the role that Campbell played in this case. It represents the type of bureaucratic obstacle that anyone from the private sector serving the state must sign in *944 order to collect the modest financial remuneration which is allowed for such service.
The substance of special counsel Campbell's service is set forth in uncontradicted affidavits in the record. As a former state and federal prosecutor, he had substantial knowledge of and experience with proper investigatory and prosecutorial procedures. He discharged his investigatory duties personally, without relying on the use of agents and without sharing any factual findings with the Attorney General or any member of her staff. While a few conversations took place between Campbell and Assistant Attorney General Brooke Nielsen, all were of an administrative nature, primarily concerning the details of the procedures by which Campbell would be paid for his services. Campbell had long since left the public sector, had no prior connection with the Attorney General's office and, since his appointment was for this one case only, he could anticipate having no future connection with the Attorney General's office more substantial than that of any other attorney in private practice. After completing his investigation, Campbell reported his findings to the Judicial Discipline Commission and prepared to commence his prosecutorial responsibilities at the probable cause hearing scheduled by the Commission.
This sequence of events as set forth by the uncontradicted affidavits in the record illustrates the very type of separation of the investigatory and prosecutorial function from the adjudicatory and legal advisory functions recommended in the Report and Recommendation to the ABA House of Delegates on the proposed changes to the American Bar Association's Model Rules for Judicial Disciplinary Enforcement. The procedures followed by the Commission and its special counsel far exceeded the due process standards that have been set forth in both state and federal cases.
It should also be apparent that Campbell's participation in these writ proceedings against the Commission is not only reasonable but mandatory, considering that so many of petitioner's allegations of impropriety focus on Campbell's actions. The majority states that, "Although the Attorney General and the Commission have continued to assert that Special Deputy Attorney General Don Campbell was not and is not acting on behalf of, or in concert with, the Attorney General's office, we put that contention to rest in Whitehead II...." In so stating, the majority implies that this court has already determined that Special Counsel Campbell is nothing more than an agent or attache of the Attorney General and that consequently, whatever responsibilities Campbell undertakes are responsibilities undertaken by the Attorney General. The majority mischaracterizes Whitehead II.
The majority in Whitehead II simply addressed respondent's contention that "the decision to employ and the selection of Special Counsel Donald J. Campbell was made solely by the Commission, not by the Attorney General." Whitehead II, 110 Nev. ___ at ___, 873 P.2d at 953. The Whitehead II majority pointed out the various ways in which it believed that the Attorney General to have acted in concert with Campbell; however, it never addressed whether the Attorney General's office and Campbell performed the same functions in this case. In fact, the majority specifically stated that it would not "decide the extent to which the Attorney General and others under her direct control and supervision have also functioned in an investigatory and prosecutorial capacity." Id. at ___ n. 2, 873 P.2d at 950 n. 2. The majority further stated, "We may have occasion to address this subject further at a later date in the course of disposing of other pending motions." Id. at ___, 873 P.2d at 955.
Given these statements and the question presented and addressed in Whitehead II, it cannot be said that this court "put to rest" any contention other than the claim that the decision to employ and select Campbell was not made solely by the Commission.[3] Considering the uncontradicted affidavits, it is difficult to determine how the majority *945 reaches its conclusion that the Attorney General's office, as opposed to Special Counsel Campbell, is investigating and prosecuting in this case. Unfortunately, it is also a conclusion forming the edifice upon which much of the majority's argument is built.

ATTORNEY MISCONDUCT
In his concurring opinion, Justice Springer also alleges that the Attorney General's office should be disqualified from continuing to represent the Judicial Discipline Commission because of misconduct. Specifically, he alleges that the Attorney General has displayed such animus and antipathy toward the petitioner "that she has rendered herself and her office unsuitable and incapacitated to serve as a prosecutorial advocate in the judicial discipline case involving Judge Whitehead" and her "running comments on this case display a continuous effort to influence public opinion against Judge Whitehead." These allegations are unsupported by any competent evidence in the record. Counsel for the Petitioner have made these allegations, but there are no affidavits or competent evidence on which this court can, consistent with due process, condemn and sanction an attorney. This is particularly inappropriate when the client Commission is also, in effect, being sanctioned.
Furthermore, Justice Springer quotes a very small portion of ARJD 8. He neglects to point out that ARJD 8 also states:
In any case in which the subject matter becomes public, through independent sources, or upon a finding of probable cause and filing of a formal statement of charges, the commission may issue statements as it deems appropriate in order to confirm the pendency of the investigation, to clarify the procedural aspects of the disciplinary proceedings, to explain the right of the respondent to a fair hearing without prejudgment, and to state that the respondent denies the allegations.
The documents in the file indicating public comments, although not authenticated or properly considered as evidence, may well conform to the part of Rule 8 quoted above. Certainly, any decision on whether Rule 8 was violated should be determined after presentation of proper evidence and an opportunity to controvert the evidence. It should also be noted that any public comments alleged to have been made by the Attorney General were made after Petitioner had waived any right to confidentiality and after he and his attorneys had apparently made extensive comments to the media.
Justice Springer seems to hold it as self-evident that adverse public comment about Petitioner automatically equates with violation of the Petitioner's due process rights. It should be apparent that such a concept has never been the law. We would have very few criminal prosecutions if that were the case.
Justice Springer quotes Collier v. Legakes for the proposition that in exercising its discretion to disqualify a prosecutor the court "should consider all the facts and circumstances and determine whether the prosecutorial function could be carried out impartially...." 98 Nev. 307, 309-10, 646 P.2d 1219, 1220 (1982). Justice Springer chooses to ignore the uncontradicted evidence that the Attorney General has not been acting as prosecutor. The uncontradicted evidence establishes that Special Counsel Don Campbell has been performing the prosecutorial function. There is not one iota of evidence that Campbell could not carry out his functions impartially or that he has engaged in any misconduct.
I agree that some violations of the rules could amount to a denial of due process, but whether due process has been provided is inherently fact-bound and requires only "such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Pre-hearing publicity can only be of constitutional dimension if it deprives the petitioner of his due process right to an unbiased decision-maker. Thus any public comments of the Attorney General would be relevant to any constitutional inquiry only if her remarks can be assumed to be of such great influence on members of the Judicial Discipline Commission so as to render the Commissioners incapable of deciding the case on the basis of the evidence at the *946 contested hearing. Nothing in the record so suggests.
Aside from the lack of evidence that the Commission members are particularly impressionable individuals, none of the remarks even alleged to be made by the Attorney General discuss the factual allegations against the Petitioner, which would be the subject of the Commission's inquiry. The discussions relate to the proceedings before this court, not proceedings before the Commission to which ARJD 8 refers. The "presumption of honesty and integrity in those serving as adjudicators," simply cannot be rebutted on such an insubstantial basis. See Withrow, 421 U.S. at 47, 95 S.Ct. at 1464.
This proceeding has been extraordinary in a number of respects, not the least of which has been the incredibly hostile tone of the pleadings. Unfortunately, the majority of this court has adopted a similar hostility toward the Nevada Judicial Discipline Commission and its counsel. This is unjustified, considering that the case involves complex legal issues, many of constitutional dimension and many of first impression. Many issues are ones over which competent and ethical attorneys and judges can legitimately disagree. Yet, this court has treated good faith disagreements with the opinions of the majority as not just ridiculous, but evilly motivated. Even attorneys whose legal reasoning is incorrect deserve to be treated with courtesy and respect, not sarcasm and vilification. We should encourage healthy, open debate on legal issues, not stifle it.
The Commission's attorneys have been especially attacked. I do not recall seeing a case in which actions of the litigant have all been attributed to the attorney without any evidence that such attribution is warranted. This seems totally unjustified in any case, but especially here where the affidavits of the individual members of the Commission refute the attribution. The members of the Judicial Discipline Commission, judges, attorneys, and non-attorneys alikeare caricatured as spineless sycophants at the tender mercies of tyrannical attorneys run amok. It is a tragedy that respected and respectable public servants who have generously given of their time, energy and abilities should be so denigrated.
The majority of this court has presumed that it has heard the conversations between the attorneys and their client, and have, in effect, accused the attorneys of:
1. Counseling "acts of resistance" (Whitehead I, 110 Nev. 128, 141, 869 P.2d 795, 803);
2. Making "extended effort to establish grounds for charges against petitioner Whitehead, and to find witnesses to support them...." (Whitehead I, 110 Nev. at 147, 869 P.2d at 807);
3. Not reading "our Goldman opinion with adequate care." (Whitehead I, 110 Nev. at 148, 869 P.2d at 807);
4. Using a special prosecutor as an attache and special deputy attorney general "to help [her] pursue ends that [she] may have desired to see realized." (Whitehead I, 110 Nev. at 148, 869 P.2d at 807);
5. Not relying "on evidentiary data compiled by original complaints," but rather on "grievances he searched out himself." (Whitehead I, 110 Nev. at 148 n. 16, 869 P.2d at 808 n. 16);
6. Counseling the Commission members "to place themselves in jeopardy of sanctions for contempt." (Whitehead I, 110 Nev. at 149, 869 P.2d at 808);
7. Counseling the Commission to proceed "in direct violation of the current procedural rules or ARJD." (Whitehead I, 110 Nev. at 162, 869 P.2d at 816);
8. "Contumaciously" withholding documents. (Whitehead II, 110 Nev. ___, ___, 873 P.2d 946, 951 (1994));
9. Violating "constitutional principles and court rules." (Whitehead II, 110 Nev. at ___, 873 P.2d at 951);
10. Engaging in "exaggerated and hysterical rhetoric as merely a transparent attempt to attract media attention and inflame public passion." (Whitehead II, 110 Nev. at ___, 873 P.2d at 953);
11. Improperly undertaking commitments "in violation of the ARJD." *947 (Whitehead II, 110 Nev. at ___, 873 P.2d at 957);
12. Demonstrating "inordinate and unexpected sensitivity...." (Whitehead II, 110 Nev. at ___, 873 P.2d at 956);
13. Attempting "to mislead this court into believing that our intervention in this proceeding is premature...." (Whitehead II, 110 Nev. at ___, 873 P.2d at 959);
14. "[P]ublicly attempting to arrogate to the Commission a preeminent right of judicial review...." (Whitehead II, 110 Nev. at ___, 873 P.2d at 964);
15. "[T]ried to capitalize on contrived `leaks' to the media (hopefully engineered by others) by basing efforts to disqualify justices upon inaccurate `leaked' material." (Whitehead II, 110 Nev. at ___ n. 33, 873 P.2d at 969 n. 33);
16. Having "not only engaged in conduct that is not in accord with the ARJD, but, as mentioned, have made false statements of fact and law to the tribunal, SCR 172, and have unlawfully obstructed Judge Whitehead's access to evidence, SCR 173." (Whitehead II, 110 Nev. at ___ n. 33, 873 P.2d at 969 n. 33);
17. Having "sought to influence this tribunal by false, abusive statements to the media and other means possibly prohibited by law, SCR 14...." (Whitehead II, 110 Nev. at ___ n. 33, 873 P.2d at 969 n. 33);
18. "[I]nciting a circus-like atmosphere...." (Whitehead II, 110 Nev. at ___ n. 33, 873 P.2d at 969 n. 33);
19. Making untrue "representations about the Commission's prior position" which were "manufactured for the purpose of persuading someone other than the Justices of this court." (Whitehead II, 110 Nev. at ___ n. 23, 873 P.2d at 963 n. 23).
The majority of this court is willing to presume not only what Commission counsel has advised, but to ascribe unflattering motivations for their actions without one bit of evidence supporting these presumptions and ascriptions. On the contrary, in some cases there is uncontradicted evidence denying the presumptions. Furthermore, the majority has adopted a hostile and sarcastic tone and characterization regarding legal arguments which competent and honorable attorneys can legitimately espouse. Furthermore, we should bear in mind that the opinions of this court are the law of this state, not necessarily because they are legally sound, but because this court is the court of last resort in this state.
I believe this hostile atmosphere has infected the proceeding and the decision to disqualify present Commission counsel. There are other forums appropriate for the determination of whether counsel have behaved appropriately. These forums provide procedures which recognize the attorney's due process rights, and where sanctions must be based on evidence, not assumptions.
The rhetoric by all parties involved in this case, as well as by the media, leaves much to be desired, but it is totally unfair to single out the counsel for the Commission. Aside from my contention that it is legally wrong, it is also unfair to deprive the Commission of its experienced counsel in the middle of a proceeding. It continues and lengthens the paralysis of the constitutionally-created system of judicial discipline in this state. The citizens of this state deserve better.
Of course, the Commission will be free to hire another prosecutor and another legal advisor, but considerable delay is inevitable. Furthermore, if a former prosecutor like Donald Campbell can take time away from his private law practice to make his investigatory and prosecutorial skills available to the public, then proceed to follow the rules of law, procedure and ethics to the best of his ability, only to be unceremoniously dismissed, surrounded by insinuations by his state's highest court that he is a ruthless political hit man of a public official he had never met prior to this case, one can be certain that his successor will have to be a very brave individual indeed. Much the same could be said for the next legal advisor to the Commission.

APPOINTMENT OF MASTER
There is no dispute that a breach of a duty to maintain confidentiality can and should be *948 sanctioned in an appropriate tribunal. I do not agree that this court should appoint a master to investigate the source of information reported in the media without serious consideration of the ramifications of such an investigation and without setting forth specific guidelines. This is a very sensitive area in which Supreme Court Rules regarding confidentiality are likely to come into conflict with First Amendment rights under the constitution of the United States and with provisions of the constitution and statutes of the State of Nevada. Justice Springer apparently believes that there are no legal concerns in such an investigation. He ignores the fact that the member of the media who was given the information is the one person (other than the perpetrator) who knows who provided it and that this person is protected from revealing his source by NRS 49.275. Justice Springer is further assuming (with no justification whatsoever) that the source is a member of Judicial Discipline Commission. Furthermore, recent events lead to the strong inference that the breach of confidentiality occurred within this court. This court should check its own personnel and procedures before casting aspersions on others.

CONCLUSION
I still protest the piecemeal handling of this case. All of the issues should be resolved in one opinion as soon as possible. The rights of the citizens of this state, as well as those of Petitioner, are at stake.
For the reasons discussed above, I would deny the motion to preclude further involvement of the Attorney General and I would defer decision on the appointment of a master.
NOTES
[1] Although the Attorney General and the Commission have continued to assert that Special Deputy Attorney General Don Campbell was not and is not acting on behalf of, or in concert with, the Attorney General's office, we put that contention to rest in Whitehead II, noting in general the contacts among Assistant Attorney General Brooke Nielsen, Mr. Campbell, and the Commission, and noting in particular, the fact that Mr. Campbell was placed under contract to the Attorney General to serve "at the pleasure of the Attorney General" and was required to "report regularly to the Attorney General concerning the status of the above-named case." Whitehead v. Comm'n on Jud. Discipline, 110 Nev. ___, 873 P.2d 946 (1994). Furthermore, the Attorney General and Mr. Campbell have both signed the bulk of pleadings filed in this matter on behalf of the Commission. Mr. Campbell appeared at oral argument and argued on behalf of the Commission along with Assistant Attorney General Nielsen.
[2] This interlocutory opinion represents one more incremental measure leading to the eventual resolution of what has become a proceeding transmuted from a comparatively simple writ proceeding to a proceeding far more expansive and complex than otherwise warranted. Petitioner simply invoked this court's exclusive jurisdiction in interpreting, for the first time, the meaning of several of the current permanent rules of the Commission. It is now clear, that in order to provide absolute clarity in the final disposition of this matter issued by this court, and to provide an unmistakable justification for this court's actions, it will be necessary to show, as the evidence will demonstrate, that the Commission has been functioning on an ad hoc basis in the imposition of discipline, and that adherence to Commission rules, in an even-handed, non-discriminatory methodology is essential to the independence of the Nevada judiciary. It is this court's intention to finalize these proceedings as soon as humanly possible, consistent with the demands of judicial responsibility and due process.
[3] NRS 228.120(2) states that the attorney general may:

Exercise supervisory powers over all district attorneys of the state in all matters pertaining to the duties of their offices, and from time to time require of them reports as to the condition of public business entrusted to their charge.
[4] In Whitehead I, Judge Guy wrote that he would "order the Attorney General, her associates and Special Deputy Attorneys General to have no further contact with this case or any other matter appearing before the Commission." Judge Guy further observed as follows:

It is certain that to permit the executive department, to wit, the Attorney General, whether upon request or otherwise, to be counsel or in any way participate in the possible disciplinary action procedure of a justice or district judge before whom the Attorney General must appear for judicial decisions, could cause investigations, brought about for political reasons or because of decisions that were unfavorable.
Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 166, 869 P.2d 795, 818-19 (1994) (Guy, D.J., concurring).
Our present opinion reflects the previously expressed judgment of Judge Guy, on this issue.
[5] In Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), the Commission in fact hired independent counsel to prosecute the judge.
[6] Our present holding relative to separation of powers is consistent with our prior rulings in this area. For example, in Dunphy v. Sheehan, 92 Nev. 259, 549 P.2d 332 (1976), this court held that the section of Nevada's Ethics in Government law excluding members of the judiciary from regulation under that law was mandated by the separation of powers clause of the Nevada Constitution. Id. at 265, 549 P.2d at 336. Similarly, in Galloway v. Truesdell, this court held that it was an impermissible violation of separation of powers to require district court judges to determine which ministers were qualified to administer legally valid marriage ceremonies. Id. at 31, 422 P.2d at 249. In In Re Platz, this court held that state bar disciplinary proceedings did not violate separation of powers because this court retained the ultimate decision as to any penalty to be imposed. 60 Nev. 296, 302-303, 108 P.2d 858, 861 (1940); see also Desert Chrysler-Plymouth v. Chrysler Corp., 95 Nev. 640, 600 P.2d 1189 (1979) (statute requiring district courts to determine "good cause" for issuing automobile dealership licenses violates separation of powers); State v. Douglass, 33 Nev. 82, 110 P. 177 (1910) (legislature may not combine the offices of Clerk of the Supreme Court and Secretary of State). This line of cases is bolstered by a persuasive opinion of the Attorney General which concludes that, because a Highway Patrol Trooper is a member of the executive branch of government, it would be "constitutionally invalid for an employee of the patrol to simultaneously serve as a member of the state legislative or judicial departments." Op. Att'y Gen. No. 168 (May 22, 1974). A member of the executive branch is simply not constitutionally permitted to act in a judicial capacity.
[7] Contrary to respondent's assertions, the Judicial Discipline Commission is not just another administrative agency which can combine investigative, prosecutorial and judging functions. As this court held in Whitehead I, the Commission is a court of judicial performance, created by the Nevada Constitution as a part of the judicial branch of government. Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 160 n. 24, 869 P.2d 795, 815 n. 24 (1994); cf., Laman v. Nevada R.E. Adv. Commission, 95 Nev. 50, 589 P.2d 166 (1979).
[8] NRS 41.0338-41.0339 would allow the Commission members to seek the representation of the Attorney General if they were sued for actions taken in their official capacity.
[9] The proposed ABA Model Rules suggest that independent counsel be retained to act as legal counsel to the commission to avoid these very conflicts.
[10] Of course the Attorney General is constitutionally authorized to pursue criminal investigations and prosecutions of judges or justices. Nev. Const. art. 5, § 22; NRS 228.175(2) and (4).
[11] The ABA Standards Relating to Judicial Discipline and Disability Retirement currently in force also note these same concerns. For example, Standard 2.1, entitled "Need for Independence," provides that "[t]he commission should be independent of and free from interference from the executive or legislative branches and, although operating within the judicial branch, should report only to the supreme court." American Bar Association, Standards Relating to Judicial Discipline and Disability Retirement 9 (February, 1978). Similarly, the commentary to Standard Rule 2.8 states that the use of law enforcement officers such as "members of the attorney general's staff" to perform commission functions "is not recommended ... [as] [t]heir use may also interfere with the independence of the judiciary." Id. at 15.
[12] The Attorney General appears in this case to have initially recognized this conflict when she requested the Board of Examiners to provide the funds to hire Don Campbell as a Special Deputy Attorney General, stating that the hiring was necessary in part because the Attorney General's office had a potential conflict of interest in this case. (Contract between Attorney General and Don Campbell.) See Petitioner's Motion to Preclude Further Involvement, Exhibit 2.
[13] The Dissent garners suggestions that the Majority in this limited Opinion somehow is, or will prevent, the Commission from carrying out its constitutional mandate. There is no intent and none should be inferred that this limited Opinion subjugates or prevents the Commission from fulfilling its duties. This limited Opinion only prevents the Attorney General, the Attorney General's regular deputies and the Special Deputy Attorney General, in this matter, from any further representation of the Commission in these proceedings, or in any proceedings before the Commission. It does not prevent the Commission from engaging its own independent counsel as provided in article 6, section 21, subsection 9(a) of the Constitution and by the rules of this court. On the contrary, this limited Opinion directs the Commission to engage independent counsel for this and any other matters before the Commission.

In Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), independent counsel was appointed for the Commission as the Attorney General either recognized the conflict or the constitutional prohibition. Likewise, in these proceedings, the Attorney General initially recognized the conflict and requested special counsel to represent the Commission. Had the Attorney General not appointed the special counsel or Special Deputy Attorney General, inter alia, responsible to the Attorney General for his retention and payment, then this limited Opinion may not have been necessary except in future proceedings.
The Dissent infers that this Opinion nullifies NRS 1.450(2). If that is the effect of preventing the Attorney General from proceeding as the attorney for the Commission, then, so be it. This will not be the first time, nor the last, that this court and other courts have stricken portions or all of legislative acts as being unconstitutional.
The Dissent raises the presumption that this Opinion rests its arguments on the assumption that the Attorney General will be unable to resist the temptation to engage in misconduct with respect to judges. This court has so often reversed judgments and criminal convictions, not upon any actual misconduct, but upon the perception or assumption that misconduct could occur, either intentionally or unintentionally. Given the history of overzealous or over-aggressive prosecutors in these United States, there can be no doubt that misconduct does and has occurred either intentionally or unintentionally.
[14] "The supreme court shall make appropriate rules for: (a) The confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5)(a); see ARJD 5 and 6.
[15] The Commission and the Attorney General's office have steadfastly opposed any investigation into the leaks, arguing at various times that Petitioner leaked the confidential information, that this court lacked the authority to enforce these constitutional provisions, and that the First Amendment prevents this court from requiring the Commission to enforce its own confidentiality rules.
[16] See, e.g., Young v. Board of County Comm'rs, 91 Nev. 52, 530 P.2d 1203 (1975).
[17] The Commission is herein authorized to obtain a Nevada attorney. There are a multitude of Nevada attorneys who are well-qualified to act as counsel to the Commission to replace the Attorney General, her staff, and any special deputy attorney general, to continue in this matter and in any other matter presently before the Commission and/or to be brought before the Commission.
[18] The Governor appointed the Honorable Addeliar D. Guy, Judge of the Eighth Judicial District Court, to sit in place of the Honorable Cliff Young, Justice, who is disqualified because he is a member of the Commission on Judicial Discipline. Nev. Const., art. 6 § 4.
[19] The Honorable Thomas L. Steffen, Vice-Chief Justice, assigned the Honorable David Zenoff, Senior Justice, to sit in the place of the Honorable Robert E. Rose, Chief Justice. Nev. Const., art. 6 § 19; SCR 10.
[1] Of course, as the Majority Opinions in Whitehead I and II have emphasized, this section of the Goldman opinion only addressed the standards of review applicable to appeals from Commission decisions to censure, retire or remove. The quoted passage does not speak to this court's authority to intervene in commission proceedings by way of extraordinary writ. See ARJD 40(7); Nev. Const. art. 6, § 4 (Nevada's "all writs" provision).
[2] In a footnote in Goldman, this court further observed that the intent to vest far greater authority in Nevada's Commission than is vested in states with "recommendation" systems is also evidenced by:

the care taken by the drafters to insure fairness, competence, non-partisanship and geographic diversity in the commission's makeup. The commission, for example, must be composed of two justices or judges appointed by the supreme court, two attorneys appointed by the state bar, and three lay members appointed by the Governor. See Nev. Const. art. 6, § 21(2). Moreover, an appointing authority may not appoint more than one resident of any county, nor more than two members of the same political party. See Nev. Const. art. 6, § 21(4).
Goldman, 108 Nev. at 267 n. 16, 830 P.2d at 117 n. 16.
[3] With respect to the Commission's power to carry its determinations into effect, the following passage from Goldman appears particularly relevant:

[T]he Nevada Constitution specifically empowers the commission to remove a judge from office for "willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance...." See Nev. Const. art. 6, § 21(6)(a). Further, the commission is authorized to retire a judge for advanced age or for a disabling mental or physical condition that is likely to be permanent in nature. See Nev. Const. art. 6, § 21(6)(b). The power to adjudicate and order the removal or retirement of a judge must necessarily imply the power to declare the office vacant. See generally, Galloway v. Truesdell, 83 Nev. 13, 422 P.2d 237 (1967). To the extent that the commission's exercise of this implied authority may have conflicted with any express ministerial duty imposed upon the governor by the legislature, the commission's power was clearly preeminent. See Goldman v. Bryan, 106 Nev. 30, 37, 787 P.2d 372, 377 (1990) (citing Robison v. District Court, 73 Nev. 169, 175, 313 P.2d 436, 440 (1957)). To hold otherwise would elevate form over substance.
Goldman, 108 Nev. at 303, 830 P.2d at 141.
[4] The Dissent correctly observes, "not every exercise of a function judicial in nature constitutes an exercise of judicial power." Nonetheless, it is evident that the Commission is empowered by the Constitution to exercise the inherent power of the judiciary to control the conduct of its own members. See, e.g., In re DeSaulnier, 360 Mass. 787, 279 N.E.2d 296 (1971); see also Nev. Const. art. 4, § 1; Nev. Const. art. 5, § 1; Nev. Const. art. 6, § 21; Goldman v. Bryan, 104 Nev. 644, 654 n. 7, 764 P.2d 1296, 1302 n. 7 (1988); Goldberg v. District Court, 93 Nev. 614, 572 P.2d 521 (1977); Dunphy v. Sheehan, 92 Nev. 259, 549 P.2d 332 (1976); Lindauer v. Allen, 85 Nev. 430, 456 P.2d 851 (1969); State v. District Court, 85 Nev. 485, 457 P.2d 217 (1969); St. Ex Rel. Watson v. Merialdo, 70 Nev. 322, 268 P.2d 922 (1954).
[5] United States v. Hastings, 681 F.2d 706, 710-11 (11 Cir.1982), cert. denied, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983), cited in the Dissent, is inapposite. The judge in Hastings sought judicial immunity from a federal criminal prosecution. The Majority Opinion obviously does not immunize judges from judicial discipline it merely concludes that the Attorney General may not act as legal advisor or prosecutor in judicial discipline matters. Moreover, the Majority Opinion expressly states that the "Attorney General is constitutionally authorized to pursue criminal investigations and prosecutions of judges or justices."
[6] See also Kamasinski v. Judicial Review Council, 843 F.Supp. 811 (D.Conn.1994); Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580 (D.C.Ct. App.1985) ("[a] defendant is not released from an obligation of confidence merely because the information learned constitutes a matter of legitimate public interest."); Cherne Indus., Inc. v. Grounds & Assoc., 278 N.W.2d 81, 94 (Minn. 1979) ("a former employee's use of confidential information or trade secrets of his employer in violation of a contractual or fiduciary duty is not protected by the First Amendment").
[7] It should be noted that the decision of the United States Supreme Court in Gentile v. State Bar of Nevada, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), is not contrary authority to our decision on this issue. The Gentile decision involved attorney speech which was censured, not because it implicated the breach of a duty of confidentiality, but because it was substantially likely to prejudice materially an adjudicative proceeding. Moreover, a majority of the Supreme Court in Gentile specifically held that the proscription of speech there involved did satisfy the First Amendment. The rule was held unconstitutional as applied on vagueness grounds only.
[8] ARJD 8 provides, in pertinent part, that Commission counsel "must refrain from any public or private discussion about the merits of any pending or impending matter, or discussion which might otherwise prejudice a [judge's] reputation or rights to due process."
[9] The actual public charges made by Attorney General Del Papa against Judge Whitehead are that (1) the judge was guilty in this case of "gross misrepresentations of fact," (2) that he was guilty of "smearing others in order to try desperately to save himself," (3) that the judge had gone "around and above the law, and (4) that "even Judge Whitehead was not above the law."
[1] This court held in Goldman that it would not undertake de novoor independentreview of Commission decisions. 108 Nev. at 267, 830 P.2d at 117-18. In this respect, we adopted the same deferential type of review that we accord other agencies.

It is true that the prosecutor before the Commission, like the prosecutor before the Board of Medical Examiners (the Board), bears a higher burden than prosecutors in most agency determinations. In most agency determinations the burden below is substantial evidence. See NRS 233B.135. In professional discipline cases, on the other hand, the burden imposed below is higher, and we review those cases to determine whether the evidence presented at the hearing was sufficient to establish, by clear and convincing evidence, that the alleged violations had been proven. See Goldman, 108 Nev. at 264, 830 P.2d at 115 (stating that burden of proof before commission is clear and convincing evidence); see also NRS 630.352(1) (requiring the Board to find violations by clear and convincing evidence before sanctioning a health provider).
Although we review the determinations of the Board and the Commission in accordance with the higher standards imposed on them by law and court rule, the fact that we do not engage in independent review is evidence that our review is deferential.
[2] This assumption is contradicted by the respondents' affidavits.
[3] I will accept this for the sake of argument even though I conclude that the record does not support it. The uncontradicted affidavits indicated that although the Attorney General's office assisted in finding an attorney and in implementing the procedural details of hiring, the Commission alone made the decision to hire Campbell.